Staunton.

## GOING'S ADMINISTRATRIX V. NORFOLK AND WESTERN RAILWAY CO.

September 11, 1916.

1. EVIDENCE—*Admissibility—Speed of Train—Presumption.*—Where the uncontradicted direct evidence of the plaintiff shows the rate of speed at which a train was running at the time the injury was inflicted, it is not error to exclude other evidence offered by the plaintiff from which a presumption is sought to be drawn that the train was running at a higher rate.

2. EVIDENCE—*Tests.*—Evidence of tests made subsequent to an accident where the conditions are materially different is not admissible in evidence.

3. APPEAL AND ERROR—*Evidence—Exclusion—Damages.*—In an action for personal injuries where the verdict was for the defendant, the plaintiff could not have been prejudiced by the exclusion of evidence relating solely to the quantum of damages, and hence such exclusion is not assignable error.

4. INSTRUCTIONS—*Evidence to Support.*—In an action for negligent injuries, it is not error to refuse instructions hypothecated upon the negligence of the defendant, when there is no evidence before the jury of any negligence on the part of the defendant.

5. INSTRUCTIONS—*Negligence—Evidence.*—In an action for negligent injuries, where there is no evidence of negligence on the part of the defendant, it is not error to instruct the jury that it is not sufficient for the plaintiff simply to allege negligence in his declaration, but that, in order to recover, he must prove negligence on the part of the defendant by a preponderance of the evidence, and that the jury cannot guess that the defendant was negligent.

6. MASTER AND SERVANT—*Railroads—Federal Employers' Liability Act—Negligence.*—Under the Federal employers' liability act, if the defendant is guilty of any negligence causing or contributing to the employee's injury or death, the defendant is liable.

7. APPEAL AND ERROR—*Printing Record—Costs—Suing in Forma Pauperis—Action Under Federal Statute.*—Under the statute of this State the costs of printing the record in this court must be paid by the appellant, or plaintiff in error before the printing is done; and as to this, there is no provision for suing *in forma pauperis.* It is immaterial that the

action is brought under the Federal employers' liability act, as the State follows its own modes of procedure though enforcing a right arising under a Federal statute.

Error to a judgment of the Circuit Court of Roanoke county in an action of trespass on the case. Judgment for the defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Welborn & Jamison,* for the plaintiff in error.

*Roy B. Smith* and *Staples & Cocke,* for the defendant in error.

Sims, J., delivered the opinion of the court.

In this action for damages there was a verdict and judgment in favor of the defendant railway company in the court below.

Plaintiff's own witnesses testified to the following facts: Plaintiff's intestate, Nathan W. Going, was a locomotive fireman in the employment of the defendant. On October 29, 1914, the day he was killed, he was engaged in his duties on a pusher engine on defendant's road between Roanoke, Va., and Blue Ridge, Va. This pusher engine had just assisted an interstate freight train from Bonsack to Blue Ridge, on the top of the mountain, and had returned to Bonsack, where it was waiting to assist another interstate train. While waiting, this engine was standing on what is known as the "middle track." There are two main tracks at this point, one for eastbound trains and one for westbound trains, and the middle track is used as

a siding, or pass track. The pusher engine was 429 feet west of defendant's depot, where it was the custom for it to stand. While it was standing there plaintiff's decedent had shaken the grates of his engine, which caused ashes and cinders to lodge on the frame under the grates on each side of the engine. At the time when passenger train No. 25, westbound, which struck him, came in sight, he was engaged in blowing the ashes and cinders off of the frame mentioned with an air hose attached to the engine for this purpose, which was a part of his duty as fireman. In order for him to do this work, it was necessary for him to be on the ground beside his engine and between it and the south rail of the westbound track. The air hose made considerable noise, in addition to the usual noise from his engine. He had his back turned toward the northeast, the direction from which No. 25 was approaching, as No. 25 was coming down the westbound track, engaged in his occupation. He had been in this position about five or ten minutes before he was struck.

At the point where Going was struck, the space between the south rail of the westbound track and the north rail of the middle track is 8 feet 2 inches, 4 inches in excess of standard railroad construction. The pusher engine, standing on the middle track, had an overhang of 30 inches over the track measured from the end of its bumper log. The engine of No. 25, coming down the westbound track, also had an overhang of 30 inches over the track, measured from the end of its bumper log. When these two engines came to be opposite each other, the overhand of both engines together took up a space of 60 inches, or five feet. This left only 3 feet 2 inches in the clear between the ends of the bumper logs, the nearest points of approach of these engines to each other. Bonsack was not a stop

for No. 25, and the train was just two minutes behind schedule time. Looking east from the pusher engine the track runs straight for 581 feet, then curves to the south, so that when passenger train No. 25 approached Bonsack, the fireman's first view of the pusher engine was of its south side, and hence he could not see Going. When within 845 feet of the pusher engine, the fireman had his first opportunity to see Going, but the engineer could not see him (Going) until within 581 feet, where the train passed from the curve to the straight track. Ordinarily this train was run through this station without diminution of speed, getting its right of way from automatic signals in a tower near the station, but at the time in question these signals were being overhauled and trains approached at diminished speed until signal to proceed was given by a signalman from the tower. To secure this signal, without which the train must have stopped at the station, the engineer called for signal by four short blasts of his whistle, and the signalman was required to respond until the engineer, by two short blasts of his whistle, acknowledged receipt of the signal to pass. While Going was at work on the north side of his engine, passenger train No. 25 was approaching from the east. "One good long blow of the whistle" was sounded within about one mile of the station. The speed of the train diminished to twenty-five or thirty miles per hour. When within 501 feet of the pusher engine the engineer of the passenger train blew four short blasts of his whistle. These were heard and answered by the signalman and heard by two of plaintiff's witnesses, one of them working within thirty-five feet of Going. The signalman then gave the signal. It was acknowledged by two short blasts of the whistle. So that after the passenger train came within 581 feet

of Going four blasts of the whistle were sounded, then a signal given, then two short blasts sounded, by which time the passenger train running at 30·miles per hour, or 581 feet in $12\frac{1}{2}$ seconds, must have run the greater part of that distance. The evidence is such that the jury might have found that the bell was ringing all the time.

Going stepped back within danger of being struck by the approaching train only twice, once before the engine of such train rounded the curve in the track so as to bring him in sight of the engineer or fireman, and once immediately before the engine struck him, when the engineer was too close to see him because of the cab of the engine shutting off the engineer's view on that side of the track, and when the engine was too close to him for it to have been possible to stop the train before striking him, and when the fireman saw him but before he could call to the engineer, Going was struck, and shortly afterwards died as a result of the injuries he received. It was customary for firemen to do the work Going was doing at the time he was killed, at the same location every day, perhaps twice a day.

As to the safety of the place of work of Going, Jennings, a fireman, witness for plaintiff, testified as follows:

By Mr. Welboro:

Q. Please give your name?

A. W. H. Jennings.

Q. What is your age?

A. I am 28.

Q. Where are you employed?

A. By the Norfolk and Western Railway Company.

Q. In what capacity?

A. Fireman.

Q. Did you ever work on the Bonsack pusher?

A. Yes, sir.

Q. Does it ever become necessary on that pusher to clean the ashes and cinders off the frame and blow them into the ashpan?

A. Yes, sir.

Q. How often is that done during the day?

A. That depends how many times you shake your grates.

Q. How many times do you usually shake your grate?

A. That depends on how dirty your fire gets.

Q. Well as an ordinary rule?

A. Two or three times.

Q. How close do you stand up to the engine?

A. You can stand up against it if you want to or you can stand back.

Q. How close do you usually stand?

A. I don't know how close, I stand up close enough to keep out of the way of other trains. . . .

Q. Whose duty is it to blow those cinders off the frame into the ashpan?

A. The fireman. . . .

Q. There is no reason why a man should not stand upon the cross ties, is there?

A. The track is always full or mighty near to the top of the ties.

Q. There is no reason even if the track is not filled up that he should stand on the tie itself and work his hose along there and there is plenty of room in there for him to stand on the ends of the ties, isn't there?

A. Yes, sir.

Q. And you usually stand that way because you realized that that was the safest place for you to stand?

A.   Yes, sir.

Q.   And standing there you feel yourself perfectly safe, don't you?

A.   Yes, sir.

Q.   And you would ordinarily do that, even though the passenger trains were passing?

A.   We do do it.

Q.   And the other firemen do it?

A.   Yes, sir.

Q.   And the passenger trains coming by there, the engineers see them there and realize that they are perfectly safe, don't they?

A.   Yes, sir.

The room in which Going had to work is shown by the plaintiff's testimony, as stated above. The un-controverted testimony of the engineer of train No. 25 was that as his engine of train No. 25 came out on the straight track he saw Going—that is, as soon as it was possible for him to have seen him—that Going was then standing close to his engine; that he did not appear to the engineer to be in danger; that it was nothing unusual for witness to pass men working on engines next to the track witness was running on—had done it frequently at that point; that witness could not tell what Going was doing, but saw him working about his engine; that he was working up close to his engine and was entirely clear of witness' train; that this was the situation of Going from the time witness first saw him until witness' view of Going was cut off by the engine witness was running getting too close to Going for witness to see him as above stated; and that the first indication witness had that Going was in danger was when the fireman *hollered* to witness, which was after Going was struck.   The testimony for the

plaintiff as to the movements of Going corroborate the testimony of the engineer.

The calculations of counsel for plaintiff by which they place Going in a position of dangerous proximity to the overhang of the bumper log of train No. 25 are not supported by the testimony in the record, and are inaccurate, as shown by such testimony, in that such calculations make the position of Going when at this work in question, after the engine of No. 25 came in sight of him and until he stepped back in the way of it, when it was practically immediately on him, from about 30 inches to 4 feet nearer to that part of the approaching engine which struck him than he was, according to the testimony of plaintiff's own witnesses. This calculation overlooks the fact that at the point where Going was at work he was partly, if not entirely, within the line of the overhang of his engine, computing such overhang from the end of its bumper log.

This action was brought under the Federal employers' liability act. The plaintiff, in her declaration, alleged four acts of negligence: First, that defendant ran train No. 25 through the station limits at Bonsack, past the place where Going was working, at an excessive speed; second, that defendant failed to use ordinary care to discover Going on or near the track and to warn him of the approach of the train after he had been discovered, or should have been discovered, by ringing the bell or blowing the whistle, or both, on the engine of No. 25; third, that the employees on the engine of No. 25 did not keep a reasonable lookout for Going; and, fourth, that the defendant did not provide a reasonably safe place for Going to work in while performing the duties required of him.

When all the evidence was in, plaintiff offered eight instructions. The court refused to give any of these

instructions, and, thereupon, over the objection of the plaintiff, gave to the jury the instruction offered by the defendant.

The assignments of error are:

One. The court erred in refusing to admit proper evidence offered by the plaintiff.

Two. The court erred in admitting, over plaintiff's objection, improper evidence offered by the defendant.

Three. The court erred in refusing to give to the jury proper instructions offered by the plaintiff.

Four. The court erred in giving to the jury, over plaintiff's objection, an improper instruction offered by the defendant.

Five. The court erred in refusing to set aside the verdict of the jury and grant a new trial, on plaintiff's motion, because the verdict was contrary to the law and the evidence.

We will consider the assignments of error in the order stated.

(1) The court erred in refusing to admit proper evidence offered by the plaintiff.

On this point the position of counsel for plaintiff, as stated in the petition, is as follows:

"First, plaintiff offered a record of defendant company, showing the time No. 25 passed Blue Ridge and Bonsack and the distance between these points, in order to show its speed when it came through the station limits at Bonsack, where Going was injured. (Record, page 163-4.) It was in evidence that the maximum speed permitted for passenger trains running between Blue Ridge and Bonsack was 45 miles an hour. The distance between these points is 5.4 miles, and the train covered it in 7 minutes. Therefore, the average speed of No. 25 between these points was in the neighborhood of 45 miles an hour. Defendant's witness, Porter, the

engineer on No. 25, was asked if his train exceeded the limit of 45 miles an hour anywhere between Blue Ridge and Bonsack; but he was not allowed to answer. And the court, on defendant's objection, refused to admit said record, and the time it took the train to cover said distance, in evidence before the jury. The defendant is, therefore, charged with the presumption that the train did not exceed the limit of 45 miles an hour, prescribed by its rules, at any time while between Blue Ridge and Bonsack. (Record, page 170.) Therefore, under this presumption, the train must have been running in the neighborhood of 45 miles an hour from Blue Ridge to Bonsack, and while running through the station limits at Bonsack, where Going was struck.

"Second, plaintiff offered to read certain rules to the jury from defendant's rule book, namely, rules number 14, 32, 106, 554 and 562. (Record, pages 165-9.) These were offered to prove the duties of the engineer and fireman on the engine of No. 25, imposed upon them by defendant's rules. Going was an experienced railroad engineer and fireman. He was familiar with defendant's rules, and he had a right to rely on the observance by other employees of the rules promulgated for the safety of employees, including himself. Rule 106 (Record, page 165) is specially important, providing that in all cases of doubt or uncertainty the safe course must be taken and no risks run. Going was undoubtedly in a position of danger, and the circumstances were charged with doubt and uncertainty as to whether he would escape or be killed. He was working very close to the westbound track, with the buzz of the air hose and the noise of the pusher engine sounding in his ears, and with his back toward the oncoming train, deeply absorbed in his occupation, and wholly unconscious of the approach of No. 25.

He was in plain view of the fireman on engine No. 25 for a distance of 865 feet, and in plain view of the engineer from a point 601 feet until No. 25 was almost on him; and his situation was so plainly charged with danger that these two employees were grossly negligent in disregarding this rule and taking chances of killing a man, when it was unnecessary for chances to be taken. Going might have cleared himself from the danger zone, or he might have gotten deeper in danger; and it was the plain duty of these employees, under the rule, to take the safe course and run no risk. They might well have warned him with bell or whistle; and, if necessary, they could have stopped the train, in order to save him. But the court, on defendant's objection, refused to admit these rules in evidence before the jury.

"Third, plaintiff also offered to show by witnesses who had taken an engine of the same class as the one that struck Going, and had made actual measurements under conditions similar to those prevailing when he was killed, except that the engine was not running, that the engineer on No. 25 could have seen Going from the time he got in sight of him, 601 feet away, until he got within 64 or 175 feet of him, depending on whether he was looking out of the front window of the engine or the side window. (Record, pages 166-7-8.) The engineer testified he thought he was looking out the side window. But the court on defendant's objection, refused to admit these measurements in evidence before the jury."

With respect to the exclusion of the evidence as to the time train No. 25 passed Blue Ridge and Bonsack and the distance between these points, to raise the presumption that the train was running at the rate of 45 miles per hour when Going was killed, plaintiff's

own witnesses testified that the train was then in fact running at the rate of "25 to 30 miles per hour, about 25 miles an hour I reckon," according to one of them, and "25 miles an hour," according to the other. This agreed with defendant's witnesses on this point. Hence, there was no conflict of the direct evidence on such point to admit of the presumption in question having any probative value. But if that had not been true, 45 miles per hour was the speed permitted this train at Bonsack; the latter was not a scheduled stopping point for it. Ordinarily, it ran by this station without signal and without diminution of speed. This Going must have known. Even if Going knew that on the day of the accident this train had to receive signal at this station, he must have known that he could not depend on its stopping, and that if it was given the signal to pass its speed would not have been appreciably lessened by the time the train passed the signal tower and reached the point opposite him. Hence, we are of opinion that the court below did not err in excluding this evidence.

With respect to the exclusion of the rules offered in evidence, they were as follows:

"Rule No. 14. A succession of short sounds of the whistle is an alarm for persons or cattle on the track, and calls the attention of trainmen to danger ahead.

"Rule No. 32. The unnecessary use of either the whistle or the bell is prohibited. They will be used only as prescribed by rule or law or to prevent accident.

"Rule No. 106. In all cases of doubt or uncertainty the safe course must be taken and no risks run.

"Rule No. 554. *Enginemen.*—They must exercise caution and good judgment in starting and stopping the train, and in moving and coupling cars, so as to avoid disturbance to passengers and injury to persons or

property; keep a constant lookout for signals and obstructions; stop and inquire respecting any signal not understood; use every precaution against fire and not permit burning waste, hot cinders, or any other thing to be thrown from the engine, and report on the prescribed form the condition of the engine at the end of each trip.

"Rule No. 562. *Firemen.*—They must report for duty at the appointed time; assist in shifting and making up the train, when required; assist the engineman in keeping a lookout for signals and obstructions, and must call the position of the semaphore signals to the engineman."

As in the case at bar the engineer of train No. 25 kept the proper lookout, saw the plaintiff's intestate as soon as he could have seen him; never saw the latter on the track or in danger, and as a matter of fact the latter never was in danger until too late for train No. 25 to have been stopped by any possibility, so that the engineer could sound the alarm for persons or cattle on the track—and as the fireman could not have seen the plaintiff's intestate in any danger before he did see him, too late to prevent the accident; there was no evidence in the case that the rules or any of them were violated, and hence they were clearly immaterial and inadmissible in evidence.

With respect to the exclusion of evidence as to experiments as to how long the engineer of train No. 25 could have seen Going, in view of what is said in the paragraph next above, this evidence, if reliable, was clearly immaterial and therefore inadmissible.

Besides, under the ruling of *Rudd's Admr.* v. *R. R. Co.*, 86 Va. 546, and *N. & W. Ry. Co.* v. *Sellenberger*, 110 Va. 606, 66 S. E. 726, 857, such evidence was not admissible in the case at bar, because the conditions

were different. In the test the man was stationed within two feet of the rail all the time. In fact, Going was never within this distance of the rail until just as he was struck. In the test the track was "comparatively straight." In the actual case it was perfectly straight. Nor does the evidence show that the engine used in the test was of the same design.

(2) The court erred in admitting over plaintiff's objection improper evidence offered by defendant.

This assignment has reference to evidence as to pay checks received by Going for 1913 and 1914 without those for prior time being introduced. This could affect only the quantum of damages plaintiff was entitled to recover and could have no affect upon the right of recovery. Hence, there was no error in this action of the court if it would have been error in any case, as to which we do not decide.

(3) The court erred in refusing to give the jury proper instructions offered by the plaintiff.

The instructions in question offered and refused by the court were as follows:

"1. The court instructs the jury that negligence is the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or doing what such a person under the existing circumstances would not have done. The duty is dictated and measured by the exigencies of the occasion.

"2. The court further instructs the jury that contributory negligence is a want of ordinary care upon the part of the person injured by the actionable negligence of another, combining and concurring with that negligence and contributing to the injury as a proximate cause thereof, without which the injury would not have occurred. Contributory negligence must have in it

the element of proximate cause, not a remote cause, but a proximate cause from which the accident or the injury, in whole or in part, directly and immediately resulted, and but for which, either by itself or by the presence or negligence of the defendant, the injury would not have occurred.

"3. The court further instructs the jury that if the defendant in this case relies upon contributory negligence as a defense, the burden is upon it to prove such contributory negligence by a preponderance of the evidence, unless such contributory negligence is disclosed by the pleadings, or by the evidence of the plaintiff.

"4. The court further instructs the jury that if you believe from a preponderance of the evidence in this case that on October 29, 1914, plaintiff's decedent, N. W. Going, was employed by the defendant as a fireman on one of its pusher engines at or near Bonsack, in Roanoke county, Virginia; and that while so employed at said time and place, he was engaged in performing the usual and customary duties required of him as such fireman, then it became and was the duty of said defendant, its officers, agents and employees, to use ordinary and reasonable care, so as not to injure him, as charged in the first, second and third counts of the declaration in this case; and if the jury further believe from a preponderance of the evidence that plaintiff's decedent, N. W. Going, was struck and injured by defendant's train No. 25, at the time and place aforesaid, while he was on or near defendant's westbound track, and engaged in the performance of his duties, as aforesaid; and that as a result of the injuries so received, he thereafter died on the same day; and if the jury further believe from a preponderance of the evidence that defendant's employees engaged on said train No. 25 failed to run said train through

said station limits at Bonsack and past the place where plaintiff's decedent was engaged in the performance of his duties on or about said pusher engine, as aforesaid, at an ordinary or reasonable rate of speed; or that said employees engaged on said train No. 25 did not use reasonable or ordinary care and diligence to discover the presence of plaintiff's decedent upon said westbound track of said defendant, or so near said track that the engine of said train No. 25 would strike him if it was run through said station limits at Bonsack and past said place, where he was engaged in the performance of his duties on or about said pusher engine, as aforesaid, and to give timely or reasonable warning of the approach of said train, by either sounding the bell or blowing the whistle, or both, on the engine of said train, after said employees had discovered his presence on or near said track, or after they should have discovered his presence there in the exercise of ordinary or reasonable care and diligence; or that said employees engaged on said train No. 25 ran said train through said station limits at Bonsack and past said place where plaintiff's decedent was engaged in the performance of his duties on or about said pusher engine, as aforesaid, without keeping a reasonable or ordinary lookout for plaintiff's decedent at said time and place; or that said employees engaged on said train No. 25 failed in any one, or more, or all of said duties; and that such failure of said employees was the direct and proximate cause of the injury and death of plaintiff's decedent, N. W. Going, then your verdict shall be for the plaintiff.

"This instruction is to be read in connection with plaintiff's instructions Nos. 6 and 7.

"5. The court further instructs the jury that if you believe from a preponderance of the evidence in

this case that on October 29, 1914, plaintiff's decedent, N. W. Going, was employed by the defendant as a fireman on one of its pusher engines at or near Bonsack, in Roanoke county, Virginia; and that, while employed as such fireman at said time and place, he was engaged in the usual and customary duties required of him as such fireman, then it became and was the duty of said defendant, its officers, agents and employees to exercise ordinary and reasonable care and diligence to provide a reasonably safe place in which plaintiff's decedent was required to work, as charged in the fourth count of the declaration in this case; and if the jury further believe from a preponderance of the evidence in this case that said defendant, its officers, agents and employees failed to use ordinary and reasonable care to provide a reasonably safe place in which plaintiff's decedent was required to work, in this, that he was required to work on and about said pusher engine, while it was standing on the middle track, just west of defendant's depot at Bonsack, and that there was not a reasonably sufficient clearance space between defendant's middle track and its westbound track for plaintiff's decedent to perform his usual and customary services on said pusher engine, while it was standing on defendant's middle track, and for defendant's trains to pass by said place where plaintiff's decedent was required to work, without striking or injuring him, and that such failure was the proximate cause of his injury and death, then your verdict shall be for the plaintiff, unless you believe from the evidence that the risk arising from such failure was ordinarily incident to his employment, or that he knew of such failure and of the risk arising from it, or that such risk was so open and obvious that an ordinarily prudent man would have observed and appreciated it.

"This instruction is to be read in connection with plaintiff's instructions 6 and 7.

"6. The court instructs the jury that if you find from a preponderance of the evidence in this case that the defendant's employees on the engine of train No. 25 were guilty of negligence, as defined in nstruction No. 1, and also that plaintiff's decedent was guilty of contributory negligence, as defined in instruction No. 2, and that their combined negligence was the proximate cause of N. W. Going's injury and death, then the plaintiff cannot recover full damages, but can recover only a proportional amount of damages, bearing the same relation to full damages that the negligence, if any, attributable to the defendant's employees on the engine of train No. 25 bears to the entire negligence, if any, attributable to them and to plaintiff's decedent.

"To illustrate, without intending to make any suggestions as to what your verdict should be: Decide first what sum of money represents full damages. Then if the negligence of defendant's employees on the engine of train No. 25 was in your judgment, for instance, three-fourths of the total negligence attributable to them and to the plaintiff's decedent, allow three-fourths of full damages. If, for instance, you conclude that the negligence of defendant's employees on the engine of train No. 25 was one-fourth of the total negligence, allow one-fourth of full damages.

"But I caution you that these figures are simply given to illustrate the meaning of the rule of law, and not as suggestions to you concerning any such verdict as you may see fit to bring in.

"7. The court further instructs the jury that if you believe from a preponderance of the evidence in this case, and under the other instructions given in this

case, that the plaintiff is entitled to recover, the amount of damages, subject to diminution for contributory negligence, as explained in other instruction, if any, is to be measured by the amount which will fairly compensate the widow and the four infant children for the pecuniary or financial loss suffered by them as the direct result of the death of the husband and father. It is not permissible for the jury to go beyond the pecuniary or financial loss and allow damages for the loss of the love of the husband and father, or to compensate them for their grief and mental anguish on account of his death, or for any other sentimental injury or loss.

"In estimating the amount of damages which you may award or apportion to the children of plaintiff's decedent, N. W. Going, you may include the loss of care, counsel, training and education which they might, under the evidence, have reasonably received from their father, and which can only be supplied by the service of another for compensation. If you further believe from the evidence that when plaintiff's decedent was struck and injured by defendant's train No. 25, at Bonsack, he was not instantly killed, but survived the injury any length of time, and that during the period intervening between fatal injuries and death, he endured conscious pain and suffering, you may add for such conscious pain and suffering such an amount as you believe from the evidence plaintiff's decedent might have recovered for such conscious pain and suffering if he had survived the injuries, which amount you will apportion between the widow and four children of plaintiff's decedent, as well as the pecuniary or financial loss, if any, which they have sustained, according as the evidence shows her or their individual loss. In this connection you should consider what the

earning capacity of the deceased was, what it probably would have been in the future, if he had not been killed, and what pecuniary or financial benefit his wife and children would probably gave derived therefrom, as shown by the evidence. In estimating the probable earnings of plaintiff's decedent and the probable length of his life, if he had not been killed, you should consider his age, habits, health, intelligence, character and probable expectancy of life, as shown by the evidence. But you are further instructed that you cannot assess damages in excess of the amount claimed in the declaration, namely $50,000.00.

"8. The court further instructs the jury that if you believe from a preponderance of the evidence in this case that when train No. 25 came within sight of N. W. Going where he was working between the pusher engine on which he was employed and the south rail of the westbound track, on which train No. 25 was running, the employees on No 25 saw him; and that there was anything to indicate that he was unconscious of the approach of train No. 25, and would not take the necessary precation for his safety; and that he was within the range of danger of being struck by train No. 25, or very nearly within range of such danger, the employees engaged on train No. 25 were not justified in presuming that he would take necessary precautions for his safety, but should have exercised such care as an ordinarily reasonable and prudent person would have exercised under the circumstances."

Of all of these instructions it is sufficient to say that they were not applicable to the case before the jury because of the fact there was no evidence of any negligence of the defendant before the jury on which to base any of such instructions. The giving of these instructions, therefore, or of any of them, would have

misled the jury. They could have had no other effect than to lead the jury to believe that the court was instructing them to weigh and consider whether certain acts of the defendant amounted to negligence, when in fact there was no evidence before them of any acts which constituted negligence. This would have been an abuse indeed of the office of instructions, which is to instruct and not to confuse and mislead the jury.

(4) The court erred in giving to the jury, over plaintiff's objection, an improper instruction offered by the defendant.

This instruction given by the court was as follows:

"The mere allegation in the declaration of the plaintiff, charging the defendant with some act of commission or omission and that such act was a negligent act, is neither proof of the act nor of its negligence. The jury cannot guess that the defendant was negligent; but the act or acts charged as negligence must be proven by the greater weight of the evidence. And it must further appear by a preponderance of the evidence that such act or acts would not have been committed by a person of ordinary care. If the plaintiff fails in either, your verdict must be for the defendant."

The instruction fairly stated to the jury the law bearing upon the vital point in the case, namely, the consideration by the jury of whether there was any proof of negligence on the part of the defendant; and in view of the absence of any proof on this point, the court committed no error in giving the instruction, or in not further instructing the jury.

(5) The court erred in not setting aside the verdict of the jury and granting a new trial on plaintiff's motion, because the verdict was contrary to the law and the evidence.

It is true that under the Federal employers' liability act, under which this action was instituted, the defendant would have been liable in damages to the plaintiff for the injury and death of the plaintiff's intestate if the latter was caused in whole or in part by the defendant's negligence. That is to say, it is true, as claimed by counsel for plaintiff, that the defendant can escape liability under this act only in a case where there is *no negligence* whatever on its part causing or contributing to the employee's injury and death. If defendant was guilty of any negligence, causing or contributing to Going's injury and death, it is liable.

But, as we have already stated, our view of the evidence in this case is that there was no evidence before the jury whatever of any negligence on the part of the defendant. As this was the conclusion of the jury also, as evidenced by their verdict, we are of opinion that the court below committed no error in refusing to set aside such verdict.

There being no conflict as to the law bearing on this case, the decision of it turning upon a question of fact, no useful purpose would be served by reference to and discussion of the authorities cited by counsel on either side further than has been done.

(6) A remaining point passed upon by the judges of this court in connection with the awarding of the writ of error therein was the denial of the prayer of the petitioner, that she be allowed to prosecute her suit in this court *in forma pauperis* and be "relieved from paying the costs of printing the record and other necessary costs;" and we have been asked in argument at the bar by counsel for appellant to note in this opinion our action on such prayer and the reasons therefor.

Counsel for petitioner set out in their brief on this subject and rely upon 36 U. S. Stat. at Large 866; act of June 25, 1910, ch. 435; and file with such brief an affidavit made in accordance with the provisions of such statute. They also cite and rely upon Art. 6, section 6, of the U. S. Constitution, and the 14th Amendment, sec. 1, of such Constitution.

The statute cited applies by its express terms only to Federal courts.

The statute in Virginia on the subject of the payment of costs of printing the record in civil cases is contained in Acts of Assembly, 1906, p. 239, 3 Pollard's Code, p. 456; and provides, in effect, that in every civil case docketed in this court the clerk thereof "shall charge to the appellants or plaintiffs in error the cost of printing the record, which shall be paid or secured to be paid to the clerk before the printing is done . ." The established procedure in this court is in accordance with this statute.

In the case of *Chesapeake & Ohio Ry. Co.* v. *Carnahan*, 118 Va. 46, 86 S. E. 863, (affirmed on the point under consideration by the Supreme Court of the United States, reported in 241 U. S. 241, 36 Sup. Ct. 594, 60 L. Ed.) this court held that although an action may be brought under the Federal statute—the employers' liability act—in a State court, the procedure in the State court, provided by its own statutes, is not affected. The particular point under consideration in that case was whether Art. 7 of the amendments to the Constitution of the United States concerning trial by jury, the result of which is to require a common law jury of twelve for the trial of all actions at law in Federal courts, applied to the trial of cases under the said Federal act in State courts; but the principle was precisely the same as is involved in the prayer of the

petitioner denied in the case now before us. We shall, therefore, content ourselves with referring to what was said by this court on the subject and authorities cited thereon in the case of *C. & O. Ry. Co.* v. *Carnahan, supra.* See also, *Minn., &c. R. Co.* v. *Bombolis*, 241 U. S. 211, 36 Sup. Ct. 595, 60 L. Ed.

For the reasons given above, we are of opinion that there was no error in the action of the court below or in its judgment complained of, and such judgment is, therefore, affirmed.

*Affirmed.*