## Richmond

PECK IRON & METAL COMPANY, INCORPORATED v. SEABOARD AIR LINE RAILROAD COMPANY.

March 16, 1959.

Record No. 4900.

Present, All the Justices.

The opinion states the case.

*Howard W. Dobbins* (*Morton L. Wallerstein; Wallerstein, Goode, Adamson & Dobbins,* on brief), for the plaintiff in error.

*Eppa Hunton, IV* and *Harry Frazier, III* (*Hunton, Williams, Gay, Moore & Powell,* on brief), for the defendant in error.

EGGLESTON, C. J., delivered the opinion of the court.

Peck Iron & Metal Company, Incorporated, sometimes hereinafter referred to as Peck or the plaintiff, filed its motion for judgment against Seaboard Air Line Railroad Company, sometimes hereinafter called Seaboard or the defendant, to recover damages for the loss of its property from a fire alleged to have been caused by Seaboard. The first count of the motion alleged that a Seaboard engine had dropped or thrown sparks on its right of way, starting a fire which was communicated to Peck's property adjacent to the railroad right of way. The second count alleged that Seaboard had negligently failed to keep its right of way free from combustible material, as a result of which a fire originating on the right of way was communicated to Peck's property.

There was a trial before a jury and at the conclusion of all of the evidence the trial court struck the evidence as to the second count. As to the first count, the case was submitted to the jury and resulted in a verdict for the defendant, Seaboard, on which the trial court entered judgment.

The case is before us on a writ of error granted Peck which contends, in its assignments of error, that the verdict is contrary to the evidence submitted under the first count, that the court erred in striking the evidence as to the second count, and in its rulings on certain instructions and the admissibility of certain evidence.

First, as to the sufficiency of the evidence to sustain the

verdict under the first count. Here Peck's case is based on Code, § 56-428, generally known as the Featherstone Act, which provides:

*"Railroads liable for damage from fires set out by their engines or trains.*—Whenever any person shall sustain damage from fire occasioned by sparks or coals dropped or thrown from the engine or train of any railroad company, such company shall be liable for the damage so sustained, whether such fire shall have originated on the company's right of way or not, and whether or not such engine is equipped with proper spark-arresting appliances, and regardless of the condition in which such appliances may be."

Under this statute the negligence of the railroad company is not an essential ingredient and the plaintiff need only prove by a preponderance of the evidence that the fire was caused by sparks or coals emitted or thrown by the defendant's engine. That fact the plaintiff may prove by direct or circumstantial evidence. *Chesapeake & Ohio Ry. Co.* v. *Seay*, 195 Va. 566, 568, 569, 79 S. E. 2d 631, 632, and cases there cited.

Specifically, Peck's contention is that it proved by circumstantial evidence that the fire was caused by sparks thrown from a Diesel engine which was pulling a southbound train, referred to in the record and briefs as "train 1758."

The factual background is not in dispute. Seaboard's double-track line runs southwardly from the Main Street Station in Richmond to Petersburg. Peck owns and operates a junk yard on Bells Road in the city of Richmond, about 4.8 miles south of the Main Street Station. Peck's property fronts 3,000 feet along the eastern side of the railroad right of way.

The fire complained of occurred on February 15, 1954, about 11:00 a. m. At that time a strong wind was blowing from west to east, the weather was dry, and there was an accumulation of grass and weeds on the railroad right of way adjacent to the Peck property. No witness actually saw sparks emitted by the passing engine. But according to witnesses testifying for Peck, no fires were visible on or near the right of way before train 1758, pulled by a Diesel engine, passed, and almost immediately thereafter several fires were discovered on the right of way near the Peck property. One fire was seen to the north of Peck's property, one to the south, and three were actually on the Peck property.

Morris Peck testified that one of the fires had started "right along beside" Seaboard's track and "was heading south into our property."

The members of a Seaboard section crew who had been working on the track just south of Peck's property, testified that they had not seen any fire on the right of way before the passing of this train and that "almost immediately" thereafter they saw a fire on the eastern edge of the right of way, south of where they were working, and another "up near Peck's."

There is evidence that a Diesel engine, which burns oil, will emit sparks under some conditions. John W. Stanley, employed as a night watchman at the Peck plant, testified that he had "very frequently" seen Seaboard's Diesel engines emit sparks when pulling "a heavy load" past the Peck property. However, this witness did not say that he had ever seen any fires started by such sparks.

Witnesses for the Seaboard testified that Diesel engines may emit sparks under two conditions. The first of these is when the engine is "first fired off" after having been idle for a time. But these witnesses further said that sparks will not be emitted after the engine has been running and gotten "hot." It is undisputed that this engine had been running continuously for more than forty-five minutes, during which time it had pulled the train more than five miles.

The second condition under which a Diesel engine will emit sparks is when it is pulling an excessive load. But, again, the uncontradicted evidence shows that this condition did not exist. It shows that on this trip this engine had a load of 1,940 tons, which was well within its limit as indicated by the ammeter or gauge located on the engine and designed to test its pulling capacity.

The further evidence on behalf of Seaboard is that this engine was carefully inspected before, during, and after its run and found to be in proper working condition. These inspections, which included a thorough examination of the exhaust stacks, gave no indication that the engine was emitting sparks. The engineer and fireman on the engine testified that, as was their custom, from time to time on this trip approaching and passing the Peck property, they looked back to check the condition of the train and saw no sparks. Two northbound trains passed train 1758 in the vicinity of the Peck property. The crew on these trains testified that they observed the engine and saw no sparks emitted or dropped by it.

The members of the Seaboard section crew who discovered the fire on the right of way shortly after train 1758 had passed, testified that in obedience to orders and in accordance with their custom, they separated as the train approached, some members stepping to

the eastern side of the track and some to the western side; that they observed the passing engine and saw no sparks emitted by it.

It is significant, too, that none of Peck's employees who were on the yard when train 1758 passed testified to having seen any sparks from the engine.

C. M. Lynch, the engineer on train 1758, testified that as the train approached the Peck property he saw a fire there which "looked like they were burning trash." Harry Snead, an employee of Peck, who first saw the fire on its yard, testified that he thought that trash was being burned, as was customary from time to time.

The substance of Peck's case is that there was combustible material on the right of way, that no fires were visible before the train passed, that almost immediately thereafter several were discovered on the right of way, and that Diesel engines do emit sparks under some conditions. Hence, it says, the jury were bound to conclude that such fires were caused by sparks emitted by this passing engine.

This argument disregards the evidence submitted by Seaboard which tends to support the jury's finding that the fire complained of was not caused by sparks emitted by this engine. The uncontradicted evidence is that the engine had been carefully inspected, found in good condition, and would not give off sparks under the then existing conditions. There is the positive testimony of a number of Seaboard's employees who were in a position to observe, and did observe, the condition of the engine as it approached and passed the Peck property, and who testified that it was not emitting sparks. Then, too, there is direct evidence that as the train approached a fire was already burning on Peck's premises. Thus, the lack of evidence on behalf of the plaintiff, plus the positive evidence in favor of the defendant, warranted the finding and verdict of the jury.

In its second count Peck alleged that its property was damaged or destroyed by a fire which started on Seaboard's right of way and spread to the Peck property as the result of the negligence of Seaboard in failing to keep its right of way free of grass, weeds and other combustible material. This count is based upon Code, § 56-426, which provides:

"*Manner in which right of way shall be kept.*—Every railroad company shall keep its right of way clear and free from weeds, grass, and decayed timber, which from their nature and condition are

combustible material, liable to take and communicate fire from passing trains to abutting or adjacent property."

In its brief Peck says: "The obvious intent of the statute is to impose on a railroad the absolute duty to keep its right of way clear of combustible material which is liable to communicate fire from passing trains *or from other sources.*"

The trial court ruled that under this statute Seaboard would be liable for fire put out by its "passing trains" and, because of combustible materials on its right of way, communicated to "abutting or adjacent property;" that if Peck had sustained the burden of proving that this fire had been put out by one of Seaboard's passing trains, it was entitled to recover under its first count and the second count was unnecessary. Consequently, the trial court struck the evidence as to the second count and refused to grant Peck's tendered instructions P-A, P-D, P-G and P-H based thereon.

Peck argues that since Code, § 56-428, on which the first count is predicated, imposes liability on a railroad company for fires caused by sparks thrown from one of its engines, Section 56-426, on which the second count is predicated, was intended to impose an additional liability for fires started on its right of way by other means and communicated by combustible material to adjacent property.

The history and language of the two Acts show the fault in this reasoning. Code, § 56-426, had its origin in the Acts of 1902-3-4, Ex. Sess., ch. 609, p. 993, and was obviously designed to lessen the danger of communicating fires set out by passing trains from the railroad right of way to adjacent property. A violation of the statute constitutes negligence, imposing liability for damages proximately resulting therefrom.

Code, § 56-428, which originated in the Acts of 1908, ch. 269, p. 388, is more comprehensive and imposes liability on a railroad company for a fire put out by one of its engines on a passing train, irrespective of negligence, "whether such fire shall have originated on the company's right of way or not." Thus, it is this later act which imposes the additional and more stringent liability on a railroad company.

Clearly, by its language, liability under Code, § 56-426, is limited to a fire from "passing trains" communicated from the right of way to abutting or adjacent property. By its terms a railroad company is required to keep its right of way clear and free of "combustible material, liable to take and communicate fire from passing trains to

abutting or adjacent property." It does not include or relate to liability for fire originating on the right of way and caused by other means.

Similar statutes in other States have been given this interpretation. *Mobile & Ohio R. R. Co.* v. *Mathis,* 188 Ky. 47, 220 S. W. 1068, involved the interpretation of a statute which required the railroad company to keep its right of way free of combustible materials which from their nature are "liable to take and communicate fire from passing trains to abutting or adjacent property." In disposing of the contention there made that that statute imposed liability for a fire on the right of way caused by means other than passing trains, it was pointed out that "The prohibition of the statute is not directed against weeds, high grass, and decayed timber in general, but only against such as 'from their nature and condition are combustible material, liable to take and communicate fire from passing trains to abutting or adjacent property.' The purpose of the statute was to prevent fires by passing trains." 220 S. W., at page 1069.

See also, 22 Am. Jur., Fires, § 36, p. 618; *Sycamore Preserve Works* v. *Chicago & N. W. Ry. Co.,* 366 Ill. 11, 7 N. E. 2d 740, 111 A. L. R. 1133; *Pure Oil Co.* v. *Chicago M. & St. P. Ry. Co.,* 56 Mont. 266, 185 P. 150.

Consequently, we agree with the trial court's interpretation and application of the statute to the present case.

■ Error is assigned to the refusal of the trial court to grant instruction P-E which would have told the jury that they could find the Seaboard liable for damages which were the proximate result of its failure to have its engine equipped with spark arresters, as required by Code, § 56-427. The instruction was properly refused.

As has been said, Peck's claim as submitted to the jury was predicated on Code, § 56-428, which in terms imposes liability on Seaboard for damages for fire occasioned by sparks or coals dropped or thrown from its engine, "whether or not such engine is equipped with proper spark-arresting appliances." Hence, the failure of Seaboard to have its engine equipped with such appliances was immaterial to the issue to be decided by the jury, that is, whether the fire complained of was caused by sparks or coals emitted by the engine.

■ Finally, complaint is made of the rulings of the trial court on the admissibility of evidence and the instructions relating to the measure or quantum of damages. It is not necessary that these rulings

be examined in detail, for it is well settled that such rulings, even if erroneous, were harmless in view of the jury's verdict which disallowed Peck's claim for any damages.

Illustrative of this principle is *Going's Admx.* v. *Norfolk & Western Ry. Co.*, 119 Va. 543, 556, 89 S. E. 914, in which we held that the admission of certain evidence relating to damages, if erroneous, was harmless error. See also, *Bardach Iron & Steel Co.* v. *Charleston Port Terminals*, 143 Va. 656, 675, 129 S. E. 687; 3 Am. Jur., Appeal & Error, § 1042, p. 597.

Similarly, it is generally held that an erroneous ruling on instructions relating to the measure or quantum of damages is harmless where there is a verdict for the defendant. 5A C. J. S., Appeal & Error, § 1773(2), pp. 1250, 1251, where numerous cases on the subject are collected; 5 Mich. Jur., Damages, § 84, p. 576.

On the whole, we find no prejudicial error in the rulings complained of, and the judgment is

*Affirmed.*