NORFOLK AND WESTERN RAILWAY COMPANY V. STEELE & SON.

September 9, 1915.

1. EXCEPTIONS—*Waiver—Motion to Quash. Summons.*—A defendant who not only relies upon, but insists that the plaintiffs are bound by the data given in its answer to summons to produce books and papers under section 3371 of the Code but introduces witnesses in its own behalf to prove the same facts, is not prejudiced by the refusal of the trial court to quash said summons.

2. CARRIERS—*Interstate Commerce—Food and Water for Stock—Extension of Time—Endorsement on Bill of Lading.*—An endorsement by the shipper on the blank margin of the "Uniform Live Stock Contract" or bill of lading, "No one in charge. 36 hr.' run requested without feed or water," is a request in writing "separate and apart from any printed bill of lading or other railroad form" in the sense and for the purpose evidently contemplated by act of Congress providing "that upon the written request of the owner or person in custody of that particular shipment, which written request shall be separate and apart from any printed bill of lading or other railroad form, the time of confinement may be thirty-six hours." Such endorsement was an affirmative and conspicuous expression of the wish of the shipper, removed from any possibility of being overlooked, or inadvertently signed along with the numerous other stipulations and the provisions usually appearing in the printed forms of shipping contracts used by railroads.

3. CARRIERS—*Interstate Commerce—Agreed Valuation.*—As the law stood at the time the shipments in controversy were made, the provision of a bill of lading fixing an agreed valuation of live stock as a basis for the freight charged, less than the published tariff rate, was clearly valid as to interstate shipments.

4. CARRIERS—*Agreed Valuation—Measure of Recovery for Delayed Delivery.*—Under a bill of lading fixing a value upon live stock and providing that in no event shall the shipper recover a greater sum, the shipper is entitled to recover any damage less than such valuation which he can prove resulted from delay in delivery, although he realized in the market more

than the amount of such valuation. The provision of the bill of lading means no more nor less than that no liability in excess of the valuation named in the contract shall, in any event, attach to the carrier, whether the damage complained of grows out of delay in transportation of the property, or its loss, destruction or physical injury.

5. CARRIERS—*Bill of Lading—Delayed Delivery—Damages—Unreasonable Provision—Contract Against Negligence.*—A stipulation in a bill of lading "that in event of any unusual delay or detention of said live stock caused by the negligence of said carrier or its employees, or its connecting carrier or its employees, or otherwise, the said shipper agrees to accept as full compensation for all loss or damage sustained thereby the amount actualy expended by said shipper in the purchase of food and water for said stock while so detained" is unreasonable, and, moreover, is in effect plainly a contract which exempts the carrier from liability for its own negligence, and is illegal.

6. CARRIERS—*Interstate Commerce—When Shipper May Resort to Courts.*—While it may be assumed that if the Interstate Commerce Commission had acted upon and approved the "Uniform Live Stock Contract" used in interstate shipments, the shipper's resort must, in the first instance, have been to said Commission, until it affirmatively appears that said Commission has acted upon it, the courts are free to deal with it.

7. EVIDENCE—*Admissibility—Collateral Facts.*—Where a carrier seeks to excuse prompt delivery by proof of destruction (by fire for which the carrier was not responsible) of a bridge on the line of one of the connecting carriers, it is permissible for the shipper to prove that a shipment by another person from the same point, over the defendant's line, to the same destination, was made the day after, and reached its destination the day before, the shipment in controversy. The mere fact that the parallel shipment was made on a different train from that on which the plaintiff's shipment was made does not in itself make the evidence inadmissible.

8. EVIDENCE — *Improper Admission — Exclusion — When Harmless Error.*—While improper evidence should be excluded, when offered, or, not having done this, the trial court should have told the jury in terms to disregard it, still no prejudice could have resulted where an instruction given was equivalent to a positive exclusion of such evidence.

9. CARRIERS—*Notice of Loss or Damage—Initial Carrier—Carmack Amendment.*—According to the spirit and purpose of the Carmack amendment of the interstate commerce act, the initial carrier is made the agent of all the carriers on the entire

route, and notice of a claim of loss or damage to the initial carrier is sufficient, even if the letter of the bill of lading in controversy be susceptible of a different interpretation.

Error to a judgment of the Circuit Court of Tazewell county in an action of assumpsit. Judgment for the plain-. tiffs. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Henry & Graham & Hawthorne,* for the plaintiff in error.

*Harman & Pobst* and *Greever, Gillespie & Devine,* for the defendant in error.

KELLY, J., delivered the opinion of the court.

This action was brought by A. J. Steele & Son, hereinafter referred to as the plaintiffs, against the Norfolk and Western Railway Company, hereinafter called the defendant, to recover damages alleged to have resulted from negligence and unwarranted delay in the transportation of three interstate shipments of live stock. These shipments originated in Tazewell county and their destination was Jersey City. There was a judgment for the plaintiffs and to that judgment this writ of error was awarded.

There were thirteen assignments of error, which, in so far as they may require separate discussion, will be disposed of in the order and by the numbers appearing in the defendant's petition.

1. A demurrer to the declaration was overruled and exception was taken to this ruling, but the exception, while not waived, was not argued either orally or in the brief. We have considered the grounds upon which the demurrer

was based and are of opinion that none of them were well taken.

2. The second assignment of error complains of the action of the circuit court in refusing to quash a summons issued at the instance of the plaintiffs under the provisions of section 3371 of the Code of Virginia.  If the court erred in refusing the motion to quash the summons, the error was not to the prejudice of the defendant, since it not only relied upon, and insisted that plaintiffs were bound by, the data given in its answer to the summons, but introduced witnesses in its own behalf to prove the same facts.

3. The act of Congress (U. S. Comp. Stat. Sup. 1911, p. 1341), making it unlawful for any railroad company over whose road cattle, sheep or other animals are conveyed from one State into or through another, to confine the stock in cars for more than twenty-eight consecutive hours without unloading for rest and food, is subject, among other qualifications, to the proviso "that upon the written request of the owner or person in custody of that particular shipment, which written request shall be separate and apart from any printed bill of lading or other railroad form, the time of confinement may be extended to thirty-six hours."  In the present case, F. R. Steele, a member of the firm making the shipment, made an endorsement in his own handwriting on the blank margin of the "Uniform Live Stock Contract," or bill of lading, covering one of the shipments, which, according to the printed record before us, was as follows:  "No one in charge. 36-hr. run requested without feed or water.  S. L. Co. Loaded O. K. per June 12, 1913."  The initials "S. L. & Co." were probably a misprint from the original "St. & Co.," an abbreviation of the plaintiffs' firm name appearing in full in the bill of lading.  The circuit court held that this endorsement was sufficient to bring the shipment in

question within the terms of the above recited proviso of the Federal statute, and permitted the same to be read to the jury. This action is the basis of one of defendant's bills of exception.

We think the exception cannot be sustained. The request was in writing and was "separate and apart from any printed bill of lading or other railroad form" in the sense and for the purpose evidently contemplated by the statute. This endorsement was an affirmative and conspicuous expression of the wish of the shipper, removed from any possiblity of being overlooked or inadvertently signed alcng with the numerous other stipulations and provisions usually appearing in the printed forms of shipping contracts used by the railroads. The evidence shows that one of the connecting carriers, the Pennsylvania Railroad, either violated the statute by keeping the stock confined for over twenty-eight hours, or construed the endorsement in question as being sufficient to warrant it in making a thirty-six-hour run without feed or water. That the latter is a correct construction to place upon the endorsement in question becomes all the more apparent if we stop to consider the poor standing which the plaintiffs themselves would have in court if they, instead of the defendant, were now attacking the validity and sufficiency of the request thus made by them. See *Wabash R. Co.* v. *United States,* 178 Fed. 5, 101 C. C. A. 133, 21 Ann. Cas. 819.

4. The fourth assignment of error raises the most controverted question in the case. It is based upon the defendant's contention that the contracts under which these shipments were made, in a form designated as the "Uniform Live Stock Contract," contained valid limitations of liability which were disregarded by the lower court. The three contracts were all in the same form and contained two separate and distinct provisions intended to affect the liability of the defendant company. Both of these provi-

sions must be read in the light of the following opening p::ragraph in the contract or bill of lading:

"NOTICE: This railway has two rates on live stock. The rate given under this contract is lower than the rate made by the railway company for the transportation of stock at the carrier's risk and without limitation of liability, and is based upon the conditions and agreement found in this contract and upon the valuations therein fixed. The shipper, by signing this contract, is deemed to accept the lower rate upon the terms and conditions specified as a part of this contract."

Coming now to the two aforesaid provisions intended to limit liability, as they appear in the contract, the first one is in the following language:

"That said shipper, or the consignee, is to pay freight thereon to the said carrier at the rate of—— per——, which is the lower published tariff rate based upon the express condition that the carrier assumes liability on the said live stock to the extent only of the following agreed valuation, upon which valuation is based the rate charged for the transportation of the said animals and beyond which valuation neither the said carrier nor any connecting carrier shall be liable in any event, whether the loss or damage occur through the negligence of the said carrier or connecting carriers, or their employees, or otherwise: . . . if cattle or cows, not exceeding $75.00 each . . . if sheep, lambs, stock-calves or other small animals, not exceeding $5.00 each. And in no event shall the carrier's liability exceed $1,200.00 upon any carload."

This provision, as the law stood at the time of these shipments, was clearly valid as to an interstate shipment, and has in effect been upheld in a long line of decisions by the Supreme Court of the United States, among the more recent of which are *Adams Express Co.* v. *Croninger*, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.)

100

257; *Kansas City R. R. Co.* v. *Carl*, 227 U. S. 639, 33 Sup. Ct. 391, 57 L. Ed. 683; *Missouri-Kansas R. Co.* v. *Harriman Bros.*, 227 U. S. 657, 33 Sup. Ct. 397, 57 L. Ed. 690; *Boston & Maine R. Co.* v. *Hooker*, 233 U. S. 97, 34 Sup. Ct. 526, 58 L. Ed. 868, L. R. A. 1915-B, 450; *Geo. N. Pierce Co.* v. *Wells-Fargo Co.* (decided February 23, 1915), 236 U. S. 278, 35 Sup. Ct. 351, 59 L. Ed.

We cannot, however, accord to this provision the meaning contended for by the defendant company, namely, that if the cattle, sheep and lambs actually brought in the market as much as their respective agreed valuation, the provision in question would operate to protect the defendant against any liability. It may be observed in this connection that if there is any doubt about the proper construction of this provision, the doubt must be resolved against the defendant. See Moore on Carriers (1906), page 351, sec. 32, and cases cited. We think, however, that in view of the history and usual purpose of provisions of this character, there can be no doubt that the one in question means no more and no less than that no liability in excess of the valuations named in the contract shall in any event attach to the company, whether the damage complained of grows out of delay in transportation of the property, or its loss, destruction or physical injury.

The language of the Supreme Court of Tennessee, in the case of *Starnes* v. *L. & N. R. Co.*, 91 Tenn. 516, 19 S. W. 675, in an action on a bill of lading where the agreed value for horses was limited to $100.00 per head, is directly in point. The court there said: "A shipper will not be heard to claim a recovery for damages or loss, however great, in excess of the amount named in the bill of lading as the agreed value; nor will the carrier be allowed to deny liability for actual damages up to that amount. The carrier must respond for negligence up to that value but no fur-

ther." See also *Ficklin* v. *Wabash Co.* 117 Mo. App. 211, 93 S. W. 861.

We are of opinion, therefore, that although the shipper realized in the market, as he did in this case, more than the agreed valuation, he was entitled to recover any damage less than such valuation which he could prove had resulted from the delay in the delivery.

The other provision in the bill of lading which the defendant relies on to limit its liability is as follows:

"That in event of any unusual delay or detention of said live stock caused by the negligence of said carrier or its employees, or its connecting carriers or their employees, or otherwise, the said shipper agrees to accept as full compensation for all loss or damage sustained thereby the amount actually expended by said shipper in the purchase of food and water for said stock while so detained."

The extra feed and water bill in this case amounted to about $20.00, and furnishes a very good illustration of how completely this clause might operate to exempt carriers from liability if its validity can be sustained. We think upon its face it is unreasonable, and it is, moreover, in effect plainly a contract which *exempts* the company from liability for its own negligence. It is not a contract limiting liability in the sense in which such contracts can be sustained, and it must, therefore, be condemned as illegal. See *Botts* v. *Wabash R. Co.*, 106 Mo. App. 397, 80 S. W. 976; *Bushnell* v. *Wabash R. Co.*, 118 Mo. App. 618, 94 S. W. 1001; *Bosley* v. *B. & O. R. Co.*, 54 W. Va. 563, 46 S. E. 613, 66 L. R. A. 871.

It is urged, however, on behalf of the defendant that this contract was based upon alternative schemes of published rates which cannot be varied by the carrier and cannot be attacked except by proceedings before the Interstate Commerce Commission. In view of the length to which the Supreme Court of the United States has gone in the case

of *Boston & Maine R. R. Co.* v. *Hooker, supra,* and other recent cases, in construing the scope of the administrative duties of the Interstate Commerce Commission, there might be some room to question the jurisdiction of the court to declare any of the terms of this bill of lading invalid, if it appeared that the same had been referred to in the defendant's tariffs and had been approved by the Commission. These decisions seem to hold that accepting the provisions in bills of lading are a part of the administrative duties and powers of the Commission, and that, Congress having acted upon the matter and delegated these duties to the Commission, the courts are without any first instance authority to interfere. In addition to the authorities above cited, see *Atchison T. & S. F. R. Co.* v. *Robinson,* 233 U. S. 173; 34 Sup. Ct. 556, 58 L. Ed. 901, and Mr. Withers' article on "Carriers' Liability on Interstate Shipments," 1 Va. Law Reg. (N. S.), 241.

But we do not find that the Interstate Commerce Commission ever approved the "Uniform Live Stock Contract," or that it is referred to in or made a part of the defendant's tariffs. The defendant, it is true, proved that its tariff rates were on file with and had been approved by the Commission, and proved that it had another form of bill of lading, designated as a "Straight Bill of Lading," carrying a ten *per cent.* higher freight rate, which the shipper might have adopted. This latter form was likewise introduced in evidence, and it affirmatively appears upon its face that it had been approved by the Commission. The "Uniform Live Stock Contract," however, does not appear to have been so approved, nor does it appear that it was in any way referred to in the company's tariffs. While, therefore, we may assume that if the Commission had acted upon this live stock contract and approved it, the plaintiffs' first resort must have been to the Commission, we think that until it does affirmatively appear that the Commission acted upon it the courts are free to deal with it.

The Interstate Commerce Commission, by its report of May 7, 1915, No. 49, (*ex parte*) *In re the Cummins Amendment,* very clearly indicates that the carriers, in what is known as the Southern Classificaticn, applying in territory east of the Mississippi and south of the Ohio and Potomac rivers, have not, as a rule, filed their live stock contracts with the Commission. The report uses this pertinent language: "Some of the tariffs of the individual carriers in this territory contain reduced rates applicable to shipment of live stock which are conditioned upon certain declared valuations and upon shipments being made under the live-stock contract, and such tariffs provide that higher rates will apply when shipments are not so made. *The terms of the live-stock contract are not incorporated in the tariffs, and with one or two individual exceptions they are not filed with the Commission as a tariff publication.*" (Italics ours.) The reports of the Commission are published by authority of the act of Congress providing for them. We refer to them here merely for the purpose of showing that it does not follow in every case that where tariffs have been filed with the Commission the contracts to which such tariffs are applied have been approved by the Commission. The burden is upon the defendant in this case to establish the validity of its bill of lading, and so far as the evidence before us goes there is nothing to show that the Commission ever passed upon the contract.

We are of opinion, therefore, that neither of the provisions in this bill of lading, so earnestly invoked by the defendant,. can avail anything against the claim of the plaintiffs in this case. And, we may add, such provisions will not hereafter be of interest because the aforesaid Cummins act, of March 4, 1915, amending the Federal interstate commerce act, invalidates all attempted agreements of this character between the shippers and the carriers.

5. Over the objection of the defendant, the court permitted the plaintiffs to prove that on the day after the first shipment here involved was made, the firm of R. K. Gillespie & Company shipped a car of lambs from the same point to Jersey City, and that the latter car reached the market a day earlier than the former. This action of the court is assigned as error, but we are of opinion that the evidence in question was properly admitted. One of the principal grounds of defense relied upon was that the delay complained of was unavoidable and due to the destruction (by a fire for which the carrier was not responsible) of a bridge on a line of one of the connecting carriers. The evidence complained of was entirely proper as tending to meet this defense. The mere fact that this so-called "parallel shipment" was made on a different train from that on which the plaintiffs' stock was shipped does not in itself make the evidence inadmissible. The proximity in point of time, and the identity of the route and termini, brings the evidence clearly within the general principles set out in *Riverside, &c. Cotton Mills* v. *Waugh, ante* p. 386, 84 S. E. 658, as to the admissibility in evidence of collateral events and occurrences which are similar to those forming the subject of the controversy. See also *Mich. Cent. R. Co.* v. *Curtis,* 80 Ill. 324, in which it was held that the loss of a depot was not sufficient excuse for delay when it appeared that subsequent shipments over the same road reached their destination in advance of the shipment involved in the suit.

6. Assignments six, eight, nine and ten deal with objections to evidence which, if conceded to have been improperly admitted, could not, in our view, have prejudiced the defendant. The only evidence which might have done so was evidence of a change of schedule for live stock shipments a year later than those in question here, and this evidence was in effect excluded from the consideration of

the jury by an instruction given at the instance of the defendant.   It is true that the court ought to have sustained the objection to the evidence at the time it was made, and, not having done this, ought to have told the jury in terms to disregard it.   We are of opinion, however, that the instruction as expressed was equivalent to a positive exclusion of the evidence.

7. The seventh assignment of error involves the sufficiency of the claim filed by the plaintiffs, giving the defendant notice under the terms of the contract of shipment. The contract in question contained the following provision:

"That no claim for damages which may accrue to the said shipper under this contract shall be allowed or paid by the said carrier, or sued for in any court by the said shipper, unless a claim for such loss or damage shall be made in writing, verified by the affidavit of the said shipper or his agent, and delivered to the general claim agent of the said carrier, at his office in Roanoke, Va., within thirty days from the time said stock is removed from said car or cars; and that if any loss or damage occurs upon the line of a connecting carrier, then such carrier shall not be liable unless a claim shall be made in like manner, and delivered in like time, to some proper officer or agent of the carrier on whose line the loss or injury occurs."

It is conceded that the notice was properly and in due time given to the initial carrier at Roanoke, and the contention here is that notice ought also to have been given to the connecting carrier.   We do not think this contention can be sustained.   If the letter of the provision is susceptible of the interpretation placed upon it by counsel for defendant, such interpretation is contrary to the spirit and purpose of the Carmack amendment, which undoubtedly makes the initial carrier the agent of all the carriers on the entire route.   The authorities, we think, sustain this conclusion. *Overton* v. *Chicago, &c. R. Co.* (Tex. Civ.

App.) 160 S. W. 111; *A. C. L. R. Co.* v. *Riverside Mills*, 219 U. S. 186, 31 Sup. Ct. 164, 55 L. Ed. 167, 31 L. R. A. (N. S.) 7.

8. Assignments eleven and twelve are based upon objections to the instructions given for the plaintiff and to the refusal of the court to give certain instructions asked for by the defendant. We have considered all of these objections and deem it sufficient to say that in so far as they involve debatable questions of importance they have already been disposed of in previous parts of this opinion.

9. This brings us to the thirteenth assignment of error, which complains of the refusal of the trial court to grant a new trial, on the ground that the verdict was "contrary to the law and the evidence."

A careful consideration of all the evidence as to each of the several shipments involved leads us to the conclusion that there was evidence sufficient to warrant the finding of the jury, and it would serve no good purpose to enter into a detailed discussion thereof.

Upon the whole case we are of opinion that the judgment of the circuit court is without error, and it will be affirmed.

*Affirmed.*