Syllabus.

𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

TAYLOR V. COMMONWEALTH.

January 10, 1918.

1. CHANGE OF VENUE—*Jury from Another County—Impartial Jury Secured.*—The trial court must be allowed a wide discretion in deciding motions for change of venue or for a jury from another county; and, moreover, where the motion is based on the ground that an impartial jury cannot be obtained in the county, the fact that an impartial jury has subsequently been secured therein is conclusive proof that the motion was without foundation.

2. APPEAL AND ERROR—*Evidence—Exceptions and Objections.*— Although evidence might, upon objection, have been properly excluded as hearsay evidence, where no objection was offered to its introduction, it must, on appeal, be regarded as a part of the evidence before the jury.

3. DYING DECLARATIONS—*Inadmissible Except in Cases of Homicide.*—Upon the trial of a husband for an assault on his wife, the dying declarations of his wife are inadmissible against him, where it appeared that her death was not the result of the assault upon her, but was caused by her taking poison with suicidal intent.

4. EVIDENCE—*Admission of Improper Evidence—Effect of the Court Striking Out Evidence and Instructing the Jury to Disregard it—Appeal and Error—Harmless Error.*—Where improper evidence has been admitted, in either a civil or a criminal case, the error is rendered harmless by the subsequent action of the trial court in striking out the evidence and specifically instructing the jury to disregard it, unless from the circumstances of the particular case there be reason to apprehend that such improper evidence has prejudiced the minds of the jury, in which latter event the error is reversible.

5. EVIDENCE—*Admission of Improper Evidence—Effect of the Court Striking Out Evidence and Instructing the Jury to Disregard it.*—In the instant case, where the dying declarations of a wife were admitted in evidence against her husband, upon his trial for assault on the wife, although her death was caused by her taking poison, a review of the evidence satisfied the Supreme Court of Appeals that the jury obeyed the instruc-

tions of the trial court to disregard the dying declaration. It is not necessary to believe that the jury entirely effaced from their minds the fact that improper evidence had been introduced; and in the instant case there was abundant evidence upon which the verdict might have been found, if the declaration had not been introduced.

6. RES GESTAE—*Assault and Battery.*—A witness testified that when he arrived at defendant's house, defendant's small boy ran out of the house crying, turned immediately and ran back inside and exclaimed, "Don't Father! Don't Father!" and came right out again, saying "Father is beating mother."

*Held*: That this testimony as to the spontaneous and simultaneous outcry of the little boy was clearly admissible as part of the *res gestae.*

7. EVIDENCE—*Admission of Improper Evidence—Effect of the Court Striking Out Evidence and Instructing the Jury to Disregard it.*—The jury are presumed to follow the direction of the court to disregard wrongly admitted evidence, at whatever stage of the case that direction may be given.

Error to a judgment of the Circuit Court of Fairfax county.

*Affirmed.*

The opinion states the case.

*Frederick R. Whippler,* for the plaintiff in error.

*Attorney-General Jno. Garland Pollard, Assistant Attorney-General J. D. Hank, Jr.,* and *Leon M. Bazile,* for the Commonwealth.

KELLY, J., delivered the opinion of the court.

James L. Taylor was indicted in Fairfax county for a felonious assault upon his wife, the charge being that he "did make an assault, and unlafwully, maliciously and feloniously did cause to said Blanch C. Taylor great bodily injury by beating, striking and bruising the said Blanch C. Taylor with his fists and by kneeling upon her body with

his knees, and throwing down the body of her the said Blanch C. Taylor with great force and violence, whereby her body, head and face was greatly injured, with intent to maim, disfigure, disable and kill her the said Blanch C. Taylor, against the peace and dignity of the Commonwealth."

The trial resulted in a verdict of guilty, fixing the punishment of the accused at two years in the penitentiary, upon which the court sentenced him accordingly.

The accused made preliminary motions for (1) a jury from another county, (2) a jury from a remote part of Fairfax county, (3) a change of venue, all of which were overruled, and the accused excepted. The alleged grounds for the motions were, that the charge against the accused had been widely discussed in the county, that threats of violence had been made against him, and that he would not be able to obtain a fair and impartial trial unless some one of the motions should be granted. With these motions were filed the *ex parte* affidavits of six residents of Fairfax county and one resident of Alexandria county, all of which, while rather brief and general in their statement of facts, may be said to have tended strongly to prove the existence of such a state of local prejudice as would have prevented the accused from obtaining a fair and impartial trial. On the other hand, however, the clerk, the sheriff and the deputy sheriff of the county, who were examined as witnesses, testified *ore tenus* to the contrary, the clerk stating, among other things, that "hundreds of jurors could be obtained (in that county) who had never heard of the case." That these witnesses were correct, and that the court properly weighed their testimony, satisfactorily appears from the sequel. From the first *venire facias* of sixteen, six jurors were found free from exception. and thereupon the court ordered "that an additional writ of *venire facias* be now issued by the clerk

directed to the sheriff commanding him to summon from the by-standers ten (10) persons of this county in addition to those heretofore summoned, residing remote from the place where the felony of which the prisoner stands accused is charged to have been committed and who do not live within three miles of said place and qualified in other respects," etc.   This order was complied with, and every one of the ten men thus summoned, being examined upon their *voir dire*, were found to be competent and qualified jurors.   There was not an exception taken to either of the sixteen jurors composing the panel from which the twelve who tried the case were selected.

This court has repeatedly held, and it is the established rule in Virginia, that the trial court must be allowed a wide discretion in deciding motions for change of venue or for a jury from another county; and, moreover, that where the motion is based on the ground that an impartial jury cannot be obtained in the county, the fact that an impartial jury has subsequently been secured therein is conclusive proof that the motion was without foundation. *Wormeley's Case,* 10 Gratt. (51 Va.) 658, 672-3; *Chahoon's Case,* 21 Gratt. (62 Va.) 822; *Bowles' Case,* 103 Va. 816, 48 S. E. 527; *Richards' Case,* 107 Va. 881, 59 S. E. 1104; *Looney's Case,* 113 Va. 924, 78 S. E. 625.

Before taking up the next assignment to be discussed, it will be quite necessary to state somewhat fully the material facts relating to the assault, as disclosed by the evidence for the Commonwealth.   The efficacy of the most material assignment in the case depends upon these facts.

There was some conflict in the evidence, but this was due mainly, if not indeed solely, to denials by the defendant himself, who was the only witness introduced in his behalf and whose character for truth and veracity was successfully and overwhelmingly impeached.   Viewing the evidence from the standpoint of the Commonwealth, as we

112

must do upon an appellate review of the case, the following facts appear: About six o'clock in the evening of March 18, 1916, while the accused and his wife and their two small children (a boy aged nine and a girl aged six were alone in an upstairs room of their home, the accused struck and beat his wife in a manner which left her prostrate and in a seriously bruised and pitiable condition. While this beating was going on, a colored man named Kenner arrived at the house to deliver some family groceries. As this man approached, the little boy ran out of the house crying, turned immediately and ran back inside and exclaimed, "Don't Father! Don't Father!" coming right out again, saying "Father is beating mother." Kenner did not enter the house and did not see the attack, but "heard a scuffling noise" in the house just before the boy came out the second time. The children then ran to the near-by homes of two of Mrs. Taylor's brothers, and the latter shortly afterwards arrived at the Taylor residence. They found the accused downstairs, perceptibly under the influence of whiskey, and Mrs. Taylor upstairs on the bed, vomiting and suffering greatly from bodily injuries. Whether the vomiting was the result of these injuries or of poison which she had taken with suicidal intent just after the attack upon her, or from an antidote for the poison, does not appear and is left to conjecture, but her injuries were grievous and painful, and such as would naturally flow from a violent assault of the kind described in the indictment. Her brother testified, without objection, as follows: "Q. What did you see on your arrival? A. I found my sister lying on the bed vomiting. Q. What else did you see? A. I saw that she had been beaten, for one thing. Q. Where was it that she had been beaten? A. She had big bruises on her arm and one on the side of her head." Subsequent closer examination by her sister and others showed that she was "covered with bruises," no-

tably severe on her stomach, back and arms. The witness Caslow, a near neighbor of the Taylors, testified, without objection, as follows: "Q. Did you go to the Taylor house that evening? A. Yes, sir. Q. Do you recall what time you got there? A. I should say about 6:30. Q. What did you do when you got there? A. I went in the dining room and mother went upstairs, and when I got in the dining room Lewis Taylor and Jim Heath were coming down stairs and were going out in the yard to fight, and when Taylor got down in the dining room he did not go out, and Mr. Heath stood there for a couple of minutes and invited him out in the yard. Taylor did not say anything, so Heath went out and went on up home, and I sat in there and talked with Mr. Taylor, and Mr. Taylor said to me, 'There is going to be hell over this thing; her brothers have taken it up.' But he said to me, 'I am fixed for it,' and he took a double-barreled shot-gun and shoved two shells in it and set it back up in the corner. Then he sat down in the chair, and the two children came and got on his lap and the little girl says, 'Papa what did you want to hit mamma like that for?' and he says, 'She pulled my hair,' and she says, 'Yes, and you beat her too,' and he says, 'Yes, I did, I slapped her face good for her.' Q. Was there anything said about clothes? A. Yes, the little girl says, 'You tore mamma's clothes off.' He says, 'No I did not,' and the little girl said, 'Yes you did, I saw you.'"

The undertaker, who prepared Mrs. Taylor's body for burial some days later, testified that he found a bruise or black spot on her stomach about four inches in diameter, and a black bruise on her arm which indicated that her arm had been nearly broken.

Before passing from this narrative of the evidence as to the assault and its consequences, it is pertinent to remark that no question is made, and none could be successfully made, as to the statements of the little girl while on

her father's lap. In so far as they were denied by him, being probably not a part of the *res gestae*, they might, upon objection, have been properly excluded as hearsay evidence, but no objection was offered to their introduction, and they must now be regarded as a part of the evidence before the jury. *Newberry* v. *Watts*, 116 Va. 730, 736, 82 S. E. 703, and cases cited.

It is also proper to add to this statement, for a reason which will hereafter appear, that after the accused had stated, as a witness in his own behalf, that he and his wife had lived happily together, the Commonwealth introduced evidence of a previous assault which he had made upon her, accompanied by a grossly abusive and profane imprecation which we will not here repeat.

The assault for which the accused was on trial occurred Saturday night. Mrs. Taylor was taken to a hospital in Washington city on Monday and died there some ten days later from the effects of the poison. The fact that she took poison at the time of her husband's attack upon her, and that her death followed in consequence, was before the jury without objection.

During the progress of the trial the Commonwealth offered in evidence, as a dying declaration, an *ante-mortem* statement of Mrs. Taylor, alleged to have been made to and written down by the witness, McIntosh. The accused objected on the ground "that dying declarations were inadmissible, except in homicide cases in fear of death impending as a result of the act of the accused." The court overruled the objection, and the following statement was then read to the jury:

"I, Blanch C. Taylor, knowing I am going to die do make this my dying statement. He had been home all day and I stayed up stairs to keep out of his way and then he come up stairs and knocked me down on the bed and jumped on me with his knees he hit me side of the head

with his fist and knocked my head against the window the children houst the window and called for there uncle Jim and ed he hen loaded his gun and said if either of those brothers of yours come in there he would kill them and he told me after I takend the poison to lay there and suffer that he would do me he come into the hospitle Sunday 26th and ask me did I make a statement to a certain man and I told him to go away that I could not talk and he said if you did to make up your mind that we would both go together please try to keep him out of here and I am afraid he will kill me if he hears of this I know he will.

"Me and my children has had a hard time living with him he has beat me a dozen times before this and the knight I takend the poison he laid over behind me in the same bed and slept all knight whild the others tried to save me."

The foregoing statement was read to the jury in the forenoon. Some hours later, and after the noon recess had intervened, the court, on its own motion, addressed the jury as follows:

"Gentlemen of the jury, it is developed by the evidence in this case that it is not claimed that the licks which it is alleged that this man gave his wife, caused her death, but it seems that the contention is that her death was caused by the taking of bichloride of mercury. Therefore, gentlemen, my opinion is, that under the law the dying declaration, which I admitted here this morning, ought not to have been admitted. The dying declaration was a memorandum that Mr. Luther McIntosh read from his note book, being a statement made to Mr. McIntosh by the wife of the defendant. I want to exclude that—you all must not consider that at all. You must efface it from your minds as if it had not been testified to." The court then asked the jurors if they could disregard the dying declaration and not allow it to in any way prejudice the

prisoner, and they "severally answered that they would not in any way consider the same."

It is conceded that it was error to admit the evidence under consideration. Dying declarations are inadmissible except in cases of homicide. 1 Greenleaf Ev., sec. 156; 10 Am. & Eng. Enc. (2d ed.), p. 370.

The question for our consideration, therefore, is: Was the error cured by the subsequent action of the court in striking out the evidence, directing the jury to disregard it, and obtaining the assurance of the jurors that they would not consider it for any purpose?

The authorities are not entirely in harmony upon the subject, but we think it may be said that the rule supported by the better reason and by the great weight of authority is, that where improper evidence has been admitted, in either a civil or a criminal case, the error is rendered harmless by the subsequent action of the trial court in striking out the evidence and specifically instructing the jury to disregard it, unless from the circumstances of the particular case there be reason to apprehend that such improper evidence has prejudiced the minds of the jury, in which latter event the error is reversible. 3 Ency. Pl. & Pr., 520; 2 R. C. L., sec. 206, 252; N. & W. Ry. Co. v. Steele, 117 Va. 788, 798, 86 S. E. 124; Smith v. Whitman, 6 Allen (Mass.) 562, 564; Commonwealth v. Ham, 150 Mass. 122, 124, 22 N. E. 704; Austin v. Carswell, 67 Hun. 579, 580, 22 N. Y. Supp. 478; State v. Collins, 93 N. C. 564, 565; State v. Eller, 104 N. C. 853, 856, 10 S. E. 313; DuRant v. DuRant, 36 S. C. 49, 55, 14 S. E. 929; Houston Hisc. Co. v. Dial, 135 Ala. 168, 185, 33 So. 268; Orr & Hunter v. Garzabold, 85 Ga. 373, 377, 11 S. E. 778; State v. Fuller, 34 Mont. 12, 85 Pac. 369, 8 L. R. A. (N. S.) 762, 765, 9 Ann. Cas. 648; Throckmorton v. Holt, 180 U. S. 552, 567, 21 Sup. Ct. 474. 45 L. Ed. 663.

The rule is stated, somewhat more liberally than we

have stated it above, in the 3rd Vol. Ency. Pl. & Pr., p. 560, as follows: "The erroneous admission of evidence may be cured by its subsequent withdrawal by the party offering it, or by an order of the court striking it out, coupled with other instructions by the court to the jury withdrawing it from their consideration, unless it is clear that they were nevertheless unduly influenced thereby, when the judgment will be reversed." A vast array of· authorities are cited in support of this text.

We shall not undertake any review of the countless authorities to be found on this subject, but shall content ourselves with an approval of the general rule as we have stated it and the following quotation from the case of *Smith* v. *Whitman,* 6 Allen (Mass.) 562, 564: "The judge having instructed the jury not to regard the testimony which he deemed wrongly admitted by him, nor to give it any consideration, we are of opinion that, even if that testimony was wrongly admitted (which is denied by the plaintiff's counsel), the claimant has no legal ground of exception. *Batchelder* v. *Batchelder,* 2 Allen (Mass.) 106; *Hawes* v. *Gustin,* 2 Allen (Mass.) ·406. In these two cases, the judge, immediately after admitting incompetent evidence, directed the jury that they must disregard it. In the cases at bar, the judge did not so direct the jury until there had been an adjournment of the court after the admission of the evidence. And the counsel for the claimant has argued that such direction to a jury removes the ground of exception to the admission of improper evidence only when given so soon as to prevent that evidence from making an impression on the jurors' minds. But such distinction is not supported by authority, nor is it of possible practical application. The jury are presumed to follow the direction of the court to disregard wrongly admitted evidence, at whatever stage of the case that direction may be given. See *Selkirk* v. *Cobb,* 13 Gray (Mass.)

313; *Whitney* v. *Bayley,* 4 Allen (Mass.) 173; *Commonwealth* v. *Shepherd,* 6 Bin. (Pa.) 283, 6 Am. Dec. 449. Cases of this kind differ from those in which new trials have been granted for the reason that irrelevant and immaterial evidence, which the court did not direct the jury to disregard, may have improperly affected their verdict."

We may add that a consideration of the decisions of the courts upon this question will disclose the fact that the courts of a few of the States make a distinction between civil and criminal cases, requiring much more strictness in the application of the rule in criminal cases. This distinction, however, is not, as we believe, generally recognized, and is without substantial foundation. The rule must be the same in both classes of cases, but its application, of course, necessarily depends upon the facts of each particular case, the question to be determined in every case being, whether there is reason to apprehend that the improper evidence has prejudiced the minds of the jury.

We are entirely satisfied, in the instant case, that the error was rendered harmless by the action of the trial court. It will be observed that the court did not rest content with excluding the evidence and specifically directing the jury to disregard it, but obtained from each of the jurors the assurance that he would not give it any consideration. A careful review of the evidence which was properly before the jury satisfies us that there is no reason to apprehend that they failed to obey the instructions of the court. It is not necessary to believe that the jury did in this case, or could in any case, entirely efface from their minds the fact that improper evidence had been introduced, but the authorities, almost without dissent, recognize the ability of the jurors, as a practical matter, to find fair and impartial verdicts in cases where they have been permitted to hear improper evidence, which has been afterwards excluded from their consideration.

That the jury, in the instant case, did not allow the so-called dying declaration to become a factor in the rendition of their verdict seems to us entirely clear; indeed, it is not too much to say that if the verdict was affected at all by the incident, the effort of the jury to keep their promise to the court and disregard the declaration, probably resulted in a more moderate punishment than they would otherwise have fixed.  At any rate, there was abundant evidence upon which the verdict might, most properly, have been found, if the declaration had not been introduced.  It is quite true that the alleged dying statement of Mrs. Taylor was pathetic and appealing in the extreme, but no more so than other evidence which was heard by the jury, either without objection, or without legal ground for objection.

The testimony of Kenner as to the spontaneous and simultaneous outcry of the little boy (clearly admissible as part of the *res gestae*), the statements of the little girl (introduced without objection), and the admissions of the accused himself while on the witness stand, fully establish the fact of the assault, while its malicious and felonious character satisfactorily appears from the nature of the injuries inflicted.  The only particular in which it can be seriously contended that the *ante mortem* statement added anything to the sum of the Commonwealth's evidence was the specific statement therein that he "jumped on me with his knees," and this was merely corroborative of what the jury might well have believed from other evidence in the case, and was certainly no more likely than some of the other evidence to arouse the just and natural indignation of the jury.  The expressions, "Me and my children has had a hard time living with him," "He has beat me a dozen times before this," etc., can hardly be considered prejudicial in view of the proof of what he did at the time of the assault for which he was being

113

tried, and in view of the rebuttal testimony of Mrs. Taylor's brother, already adverted to, from which it appears that Taylor had beaten and cursed his wife upon at least one previous occasion. The fact that she had taken poison with suicidal intent and died as a result thereof, which was developed in connection with the introduction of the *ante mortem* statement, otherwise fully appears in the record, and cannot, therefore, be urged as any reason why the declaration or the evidence in regard thereto operated to the prejudice of the accused.

Upon the facts of this particular case, to which, of course, our decision is limited, we have no difficulty in holding that the error in admitting the evidence in question was cured. The verdict itself, when viewed in the light of the proper testimony in the case, seems to us entirely satisfactory evidence upon which to base this conclusion.

There were sixteen assignments of error in the petition upon which the writ of error in this case was granted; two of them were virtually waived in the argument before this court, and the others, with the exception of those which have been disposed of in the course of this opinion, are plainly without merit, involve no novel questions, and neither call for nor warrant any further discussion.

The judgment is affirmed.

*Affirmed.*