# Richmond

## J. C. ABDELL V. COMMONWEALTH OF VIRGINIA.

April 10, 1939.*

Record No. 2092.

Present, All the Justices.

*Rehearing refused June 14, 1939.

The opinion states the case.

*Ivor A. Page, Jr.*, and *Venable, Miller, Pilcher & Parsons,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Edwin H. Gibson, Assistant Attorney-General,* and *Walter E. Rogers, Special Assistant,* for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

This writ of error brings under review the judgment of the Corporation Court of the city of Norfolk, overruling the motion of the accused, J. C. Abdell, for a new trial and sentencing him to be electrocuted for the murder of his wife, Audrey Abdell, in accordance with the verdict of the jury.

It is assigned as error that the trial court erred in refusing to exclude from jury service venireman R. L. Gornto after he had been examined upon his *voir dire* and accepted as a juror by the court. When examined upon his *voir dire,* Gornto stated that he had formed a "hypothetical" opinion of the guilt of the accused from what he had read in the newspapers; that it was not a fixed opinion; that he was not sensible of any bias for or prejudice against the accused; that he could give accused a fair and impartial trial according to the law and the evidence; that he did not know either accused or his wife.

It is true that Gornto, when examined by counsel for accused, stated that the opinion he had formed was not favorable to accused. However, when asked this question by the court: "Mr. Gornto, can you go into this jury box with an open mind and wait until all the evidence is introduced before reaching a conclusion in this case?" His reply was, "I think so; yes sir."

In *Ballard* v. *Commonwealth,* 156 Va. 980, 159 S. E. 222, 229, Mr. Justice Holt said:

"If intelligent jurors are to be secured, then there must be some relaxation of rules as to their competency. Most intelligent men and all educated men read newspapers, and they would have to be more than human if they did not form some opinion from accounts which they give of homicides like this, locally of intense interest to everybody. To reject them for this reason is to put a premium upon ignor-

ance. What these men in substance say is that they have opinions upon what they have read, but that they can go into the jury box and give fair judgment on the case as it is unfolded during the progress of the trial. More than this could not be expected from honest men of good intelligence.

" * * * * * * *

"Where, as here, jurors are examined in detail both by counsel and by the judge, the rule that a judge's judgment should be given weight applies with particular force. He, better than anyone else, can gauge their candor and their purpose to give fair judgment on the evidence."

The doctrine announced in that case was approved in *Cox* v. *Commonwealth,* 157 Va. 900, 910, 162 S. E. 178, 182, in an opinion delivered by Mr. Justice Hudgins. In the course of the opinion this is said:

"In *Robinson's Case* (*Robinson* v. *Commonwealth*), 104 Va. 888, at page 892, 52 S. E. 690, 691, Judge Keith quoted the syllabus in the *McCue Case* (*McCue* v. *Commonwealth*), 103 Va. 870, 49 S. E. 623, as follows:

"The trend of recent decisions is in the direction of limiting rather than extending the disqualification of jurors by reason of mere opinion, hence the courts inquire into the character of that opinion. If it is a decided or substantial opinion as to the guilt or innocence of the accused, no matter upon what ground it was formed, the juror is incompetent, but if the opinion is merely hypothetical, and the court is satisfied from an examination of the juror on his *voir dire,* or otherwise, that he is not biased or prejudiced, and that he can give the prisoner a fair and impartial trial according to the law and the evidence, he should be accepted. No fixed and invariable rule can be laid down whereby to test the competency of the jurors, but each case should be determined by its own facts and circumstances, and great weight should be attached by an appellate court to the opinion of the trial judge."

A careful examination of the questions propounded to Gornto and the answers given thereto, plainly demonstrates that he was an impartial juror. However, his name

was stricken from the panel. The assignment of error is without merit.

There are twenty-nine additional assignments of error set forth in the petition, but in view of our ultimate conclusion, no good purpose can be accomplished by a minute discussion of those assignments, which in our opinion, are without merit.

Assignments of error 8, 16, 18 and 29 challenge the action of the trial court in refusing to strike the evidence of the Commonwealth at the conclusion of the Commonwealth's case, and in refusing to set aside the verdict of the jury as contrary to the law and the evidence.

The pertinent facts relied upon to sustain the conviction of J. C. Abdell are: On Monday, the 11th day of May, 1938, the body of Mrs. Audrey Abdell, wife of the accused, was found in the kitchen of her residence in the city of Norfolk. H. A. Shannon, a police sergeant of the city, stated in substance that he lived in the neighborhood of the Abdell residence; that at approximately 4:30 P. M. he was called to the Abdell residence; that as he approached the front of the house he smelled the odor of gas; that he went to the door and tried to gain an entrance, but found the door and windows securely closed; that he broke out a window pane and unlatched the window and entered the kitchen; that he observed the body of Mrs. Abdell upon the floor; that after opening the door to permit the circulation of air, he went back to the gas stove and cut off the six open burners; that he took hold of Mrs. Abdell's arm, but that *rigor mortis* had set in and artificial respiration could not be given; that the body was lying immediately in front of the gas stove with a blanket covering the body, except the head and feet; that a second blanket was tucked into the flanges over the gas jets of the stove and hung down, tent-like, in front of the body which was facing the stove approximately eighteen inches therefrom; that underneath the nose there was a stream of blood extending ten feet or more to a pantry door; that there was no blood upon the blankets or wearing apparel; that all the doors and windows of the

house were tightly closed; that he notified certain police officers and the city investigator.

Dr. C. D. MacDonald, coroner of Norfolk, stated that he performed an autopsy upon the body of Mrs. Abdell; that he ascertained from tests that she died of carbon monoxide poison; that upon examination of the body he found multiple bruises and abrasions on the body; that they consisted of a black discoloration around the right eye, a bruise over the right cheek from the right ear to within a half inch of the right eyelid, a bruise on the left cheek, a bruise and cut on the inside of the mouth, bruises and abrasions on the arms and elbows, a bruise on the left leg the size of a man's hand, an abrasion on the left shoulder, an abrasion on the outside of the right knee, an abrasion on the frontal bone, deep bruises and swelling on both sides of the chin, and on the scalp, back of the head a bruise that measured across two inches and up and down one inch. The witness further stated that in his opinion the condition described was the result of blows administered to the body, sufficient in themselves to produce unconsciousness.

Mrs. A. J. Wright stated that she lived in the upstairs of the Abdell residence; that she saw Mrs. Abdell on the morning of May 11th; that her condition was normal; that Mrs. Abdell consented to deliver her laundry to the laundryman that morning; that "she said she was going to be there all morning doing some ironing and would see me down town that afternoon"; and that a young son of the Abdells' was in the house when she left to go to work.

The Abdells' son, James C. Abdell, Jr., stated that on the morning of the tragedy his mother was in good spirits, and perfectly normal; that on the day before her death his mother informed him that she found two notes (which will be later referred to) in his father's room; that at her request he put an extra latch on her door; that his father came to the house frequently, but had not spent the night in the home for years—two or three; that he heard his father threaten his mother; that "he told her that one of these days she would be among the missing"; that on one occasion

he had threatened to kill his father. The two notes found by Mrs. Abdell are as follows:

"My Dear Clifton and Bobby,

"I'm going away on a long trip and not coming back. I want you both to love and obey your Daddy for I realize that even with his mistakes he has been far better than the average father. I also realize more than ever, these past few weeks, that I have not been the kind of wife I should. You boys do not understand now, but with God willing I hope some day you will.

"So now before leaving, may I again say, be good, be kind, be true and mind your Daddy and I'm sure he will always stick by you.

"Lovingly

"Mum."

and

"Dear Clifton,

"I am going away but before I go away I wish you all the luck and happiness in the world. I know you have done many things you should not of done, but I let my jealousy and madness get the best of me and now I realize there is little or no happiness for us together because of my many shortcomings, and I beg you to forgive me for leaving, forgive me for being the deceitful and rotten wife I have been and forgive me for causing you so much worry, so many heartaches, by talking about you to everyone, by pulling always against you, by making the children work against you and by letting my meanness ruin you and everything you worked and strived for. I am leaving the children in your care for I know you'll take good care of them. May God bless you."

Robert Abdell, a son of accused, stated that on May 8th his father told him that he was going away and gave him a sealed note, with instructions to telegraph him if anything happened, and if not, to return the note to him. That note was as follows:

"Sonny boy: If you need me before I get back, wire me collect. J. C. Abdell. In care of Hotel Harrington. Washington, D. C. You be a good boy and always remember your daddy loves you, no matter what anybody says."

Instead of returning the note to his father, the boy delivered it to the police.

Leon Nowitzky, investigator for the city coroner, stated that he visited the Abdell home in response to a police call; that he saw the body of Mrs. Abdell upon the floor; that he found inside of the stove several newspapers; that between the papers he found a man's wet handkerchief; that he examined the white porcelain handles to the gas jets for fingerprints, but without success; that he obtained from Mr. Swartz, the probation officer, the two notes purported to have been written by Mrs. Abdell; that the accused admitted that he—not Mrs. Abdell had written the notes; that, in response to a message sent by him, accused returned to Norfolk; that he saw scratches upon the face of the accused; that he asked accused if he had had a fight, and accused replied, "Oh just a woman"; that accused told him that he had left Norfolk on Monday night, had arrived in Washington, D. C., at eleven o'clock on Tuesday and had not been back to Norfolk until notified of his wife's death.

J. M. Palmer, a resident of Norfolk, testified that as he was driving by the residence of the accused on the morning of May 11th, at approximately 9:30 A. M., he saw a man coming out of the front door, that he appeared to be very nervous, excited, and pale; that the man's appearance attracted his attention; that he "slowed down" the speed of his car and looked at the man as he walked off the porch; that as he stepped down he reached up and pulled his hat down over his face; that the man he saw coming out of the house was the same man he saw in the city jail; that the accused is the man who came out of the Abdell house; that he was dressed in a dark suit of clothes and wore a gray felt hat with a dark band around it.

It further appears from the evidence adduced by the Commonwealth that the accused was leading a dual life; that he and his wife were not living together as man and wife, though he frequently visited the home occupied by his wife; that he maintained a residence in another part of the city where he lived with another woman, as man and wife, under the assumed name of Williams; that Mrs. Abdell was aware of this illicit relationship, and that he had had numerous quarrels with his wife; that on his way to Washington on May 11th he met Mrs. M. Facchini, an acquaintance; that she inquired about the scratches on his face; that he did not answer her inquiry, but asked her not to tell anyone that she had seen him; that he gave to the police and a news reporter a false account of his movements on May 11th; that when notified of his wife's death, he called his sister over the 'phone, and after a telephone conversation, left for Norfolk; that when he arrived in Norfolk he did not go to his home and seek out his children, but went to the home of his sister and then went to the residence of his attorney; that he went to the funeral home where the body of his wife was, had an interview with a police officer, but did not view the corpse; that he went to the Williams' residence and asked Mrs. Williams to state that she put the scratches on his face; that he told Nowitzky that Mrs. Williams scratched him; that he did not specifically deny that he had threatened his wife; and that he admitted that he and his wife had quite a "tussle" on the morning of the 11th of May.

The record also discloses that accused, when testifying in his own behalf, made contradictory statements as to his reason for giving his son the note which carried the inference that "something" was expected to happen. His first explanation was that his wife was not at home. His second explanation was that the boy said his mother was upstairs. His third explanation was that in answer to the question, "Son where is your mother?" his son answered: "I don't know. Gone out I guess."

It further appears from the record that accused while testifying, did not deny the statement of Palmer that on

the morning of May 11th, he was wearing a dark suit of clothes and a gray hat with a dark band around it.

On the other hand, the accused, to show he was innocent of the charge of murder, testified that he did not murder his wife. The accused further stated that after the fight with his wife she secured a butcher knife and threatened to kill him; that he ran out of the house in his shirt sleeves; that after he got out on the porch, his wife said:

"All right damn your soul. I have got you where I want you and you will go to the penitentiary for this"; that he left home prior to 9:30 A. M. The accused also gave to the jury his version of why he wrote the notes introduced in evidence by the Commonwealth. He said the note to the son was written pursuant to his usual custom of keeping his family informed as to his whereabouts. The notes which were supposed to be written by Mrs. Abdell were written because of an agreement that a suit for divorce might be instituted.

To further support the defense that Mrs. Abdell was not murdered, the accused introduced as a witness William N. Miller, who testified that a short time prior to the tragedy he had worked as a paperhanger and carpenter in the Abdell house; that the job was uncompleted when he left on Friday; that he left his tools in the house; that on Wednesday, May 11th, he returned to the Abdell house, arriving there at approximately ten o'clock in the morning; that in response to his second knock upon the door Mrs. Abdell came to the door "and raised the blinds to see who it was"; that he inquired if Mr. Abdell was at home; that she replied he had gone away; and that he did not see any bruises on her face, as the door was opened only about three or four inches and he did not "have a view of her face." On cross-examination, Miller stated that he had informed counsel for the accused of his visit to the Abdell home since the beginning of the trial.

Dr. F. Vann, a witness for the accused, testified that in his opinion the conclusion of Dr. MacDonald that Mrs. Abdell

was rendered unconscious by the blows she received was a matter of mere speculation.

Dr. Arnold F. Strauss testified that he was the pathologist at a local hospital; that he was formerly a pathologist at the University of Berlin; that he had performed approximately eight hundred post mortems; that he had supervised six thousand post mortems; that he was familiar with the results following monoxide poisoning; that following a slight injury, carbon monoxide poisoning would produce a distinct hemorrhage; that one who died of monoxide poison would not lie flat on the back but would take an abnormal position such as contracting the arm or leg; that as a pathologist he could not state whether or not the bruises disclosed by the photographs taken of Mrs. Abdell's body would produce unconsciousness.

The main reliance of the accused to support his plea of not guilty is based upon the alleged failure of the Commonwealth to prove by circumstantial evidence the *corpus delicti*, in view of the evidence adduced by accused to sustain the theory that Mrs. Abdell committed suicide.

That circumstantial evidence is legal and competent in criminal cases, cannot be questioned and if it is of such a convincing character as to exclude every reasonable hypothesis other than that the accused is guilty, it is entitled to the same weight as direct testimony. *Longley* v. *Commonwealth*, 99 Va. 807, 811, 37 S. E. 339. It is also true that when a conviction is sought upon circumstantial evidence alone such evidence is to be acted upon with the utmost caution, and before a verdict of guilty is warranted, every fact necessary to establish the guilt of the accused must be proved beyond a reasonable doubt.

Since the decision of this court in *Dean* v. *Commonwealth*, 32 Gratt. (73 Va.) 912, it is also true that the burden is upon the Commonwealth, where circumstantial evidence is relied upon to support a conviction, to show that "time, place, motive, means and conduct concur in pointing out the accused as the perpetrator of the crime."

Since the verdict of the jury has settled all conflicts in the evidence in favor of the Commonwealth, the question is, does the case made out by the Commonwealth sustain the verdict of guilt?

A painstaking examination of the voluminous record leads inevitably to the conclusion that the Commonwealth has successfully borne the burden imposed upon it by the law. A summary of the Commonwealth's evidence demonstrates that the accused was leading a dual life; that he lived in a state of adultery with another woman; that he had numerous quarrels and fights with his wife; that on two occasions he made threats against her; that he left a note with his son instructing him to send him a wire to Washington if anything happened. The natural inference from subsequent events being that he expected something to happen to his wife; that he gave a false account of his actions after leaving Norfolk; that he persuaded his mistress to give a false account in regard to the scratches upon his face; that he sought to keep secret his accidental meeting with Mrs. Facchini upon the highway; that he was the author of the two notes which bore the plain inference that his wife contemplated suicide; that the discovery of those notes by Mrs. Abdell so alarmed her that she had her son to put an extra lock upon her bedroom door, and that she delivered the notes to the probation officer; that accused was devoid of affection for his wife, as shown by the fact that he did not make any inquiry in regard to the cause of her death or even view her body when a visitor to the funeral home; that the accused had an opportunity to commit the crime, as shown by the evidence of Palmer who saw him leave the Abdell home in the manner described by the witness; that Mrs. Abdell died of monoxide poison; that the accused had a specific motive for committing the murder in order to escape the threat of a penitentiary sentence, as shown by the evidence of the accused; that the theory of suicide is untenable for the reason that Mrs. Abdell was in good spirits on the morning of the tragedy; that she promised to meet

Mrs. Wright in the afternoon; that after the fight with her husband, she, instead of suggesting suicide, threatened him with a penitentiary term. The theory of suicide is also untenable for the reason that every vestige of evidence relative to the position of the body, the placing of the blankets upon the gas stove, and the lack of finger prints on the stove handles, negatives such a conclusion.

In our opinion the assignment of error is without merit and the verdict of guilty should be sustained, unless there was error committed by the trial court in some other respect.

The first, second, ninth, twelfth and thirteenth assignments of error relate to the action of the trial court in refusing to allow counsel for the accused to examine, before the trial, the several notes written by the accused and heretofore referred to, and a diary kept by the accused. The record discloses that these papers were introduced over the objection of accused, after an examination by counsel, and the diary was used by the attorney for the Commonwealth in his cross-examination of the accused and the accused's witness Miller. No authority is cited to sustain the contention of counsel.

In 14 American Jurisprudence, p. 915, this is said: "As a general rule the accused is not, as a matter of right, entitled to have evidence which is in possession of the prosecution for inspection before trial." This, in our opinion, is the proper rule. A different rule would tend to subject the attorney for the Commonwealth to great annoyance, to the probable destruction or loss of material evidence, and to compel the Commonwealth not only to furnish the accused with a full bill of particulars, but to supply the accused with the physical evidence it intends to introduce upon the trial. Such a rule as is urged by accused would, in our opinion, subvert the whole system of criminal law.

There is no merit in the assignments of error.

Assignments of error three, six and seventeen are interrelated and challenge the action of the court in refusing, before trial, during the trial and at the conclusion of the Commonwealth's case, to require the attorney for the Com-

monwealth to elect whether or not the prosecution was based upon murder by monoxide poison or by the assault committed by accused upon his wife. The accused was indicted under the short form of indictment now generally used.

Upon motion of the accused, a proper bill of particulars was filed, and at the conclusion of the Commonwealth's case, the accused was fully apprised of the charge against him, as shown by the following excerpt from the record; when the motion was made to require an election, the attorney for the Commonwealth said, "I say, your Honor, that the evidence of the Commonwealth discloses the fact that the actual death was produced by carbon monoxide poison." When we look to the record it is apparent that accused was not prejudiced, as his whole defense is based upon the theory of death by suicide caused by the inhalation of monoxide poison.

If the question were debatable, the decision of this court in *Smith* v. *Commonwealth,* 21 Gratt. (62 Va.) 809, 811, completely answers the contention. There it is said:

"It is a well settled principle of criminal pleading and practice, that several modes of death, inconsistent with each other, may be set out in the same indictment. This grows out of the very necessity of the case. The indictment is but the charge or accusation made by the grand jury with as much certainty and precision as the evidence before them will warrant. In many cases the mode of death is uncertain, while the homicide is beyond question. Every cautious pleader, therefore, will insert as many counts as will be necessary to provide for every possible contingency in the evidence. If the mode of death is uncertain, he may and ought to state it in different counts, in every possible form to correspond with the evidence at the trial as to the mode of death. * * * "

The action of the court in refusing to grant a second continuance of the case is assigned as error. The only ground assigned was the fact that counsel was then, or expected to be, engaged in other cases.

 The doctrine that a motion for continuance is addressed to the sound discretion of the trial court is firmly embedded in our jurisprudence, as is evidenced by the decisions of this court in cases too numerous to mention. See Michie's Digest, under the head of "Continuances." There is no merit in the assignment.

 It is contended that the court erred in permitting the witness Councill to testify that the accused rented a house under the name of Williams. The evidence was most relevant, as it showed the relations between accused and his wife, and also the relations between accused and his mistress, Mrs. Williams.

The next assignment of error is based upon this situation, as shown by the brief:

"The accused offered three witnesses who testified that the Saturday before the trial they went to the Abdell home and performed the following experiment: they turned the gas burners on full, went out on the back porch, and closed the door. The odor of gas could be detected coming from the keyhole at the end of three minutes; at the end of six minutes gas could be smelled within two feet of the door, and at the end of ten minutes the odor of gas could be detected at any place on the porch.

"This evidence was introduced to support the defendant's theory that Mrs. Abdell was still alive at ten o'clock, since the Commonwealth had introduced evidence of the grocery boy who stated that when he delivered the groceries to the Abdell home at about ten o'clock on May 11th, he knocked at the kitchen door several times and received no response. He states that he did not smell the odor of gas. Witnesses for the Commonwealth had fixed the time of the defendant's departure at about nine-thirty o'clock."

 In our opinion this evidence was properly excluded because it was too remote in point of time and there was an utter lack of evidence showing that the gas test was made under conditions similar to those existing at the time the boy delivered the groceries at the Abdell home. The burden was upon the accused to show similarity in the essential

conditions. This burden he has failed to carry. See *Going's Adm'x* v. *Norfolk & W. Ry. Co.*, 119 Va. 543, 89 S. E. 914; *Neice* v. *Norfolk & W. Ry. Co.*, 155 Va. 211, 154 S. E. 563; 22 C. J. 758.

It is further assigned as error that the trial court erred in refusing to declare a mistrial because of an alleged improper question asked the accused by the attorney for the Commonwealth. In the cross-examination of the accused, he was asked this question:

"I have not said anything about the diary. I asked if you made any records. Mr. Abdell, I am asking you this because you said the paperhanger didn't know whether you finished the work or not. He said he knew the work was not finished; that he went back to finish it. Don't you know that he is as irresponsible as he could be in what he does say?"

In response to the motion for a mistrial the court instructed the jury as follows:

"Gentlemen of the jury the court has determined the question is improper because it contains an implication. The Commonwealth Attorney may test the knowledge of this witness or any other witness as to the reliability of any other party whose testimony is material to the cause, but he should not contain any reflection on the witness, and the court therefore strikes the evidence out, eliminating that question from the record."

In support of the motion for a new trial, counsel rely upon the recent case of *Kanter* v. *Commonwealth*, 171 Va. 524, 199 S. E. 477, 480. In that case a character witness for the accused was asked this question:

"Did you ever hear of his (meaning Kanter) buying copper wire that was stolen from the Coast Guard Station at Virginia Beach?"

Answer:

"I did not."

In holding that this was reversible error, the court said:

"It must be conceded that the general rule is, that the representative of the Commonwealth is afforded a wide

range in his cross-examination of a witness who has testified to the good reputation of a defendant, but that range must be confined within the limits of good faith and fair dealing and must be based upon facts, general rumor or report."

The distinction in the two cases is apparent. In the *Kanter Case* the obnoxious question was asked a character witness who had no means of refuting the implication. In the case at bar the question was asked the accused who had called Miller as a witness and had vouched for his integrity and veracity. If, however, we concede that the question was improper, the instruction of the court cured the error, if we conclude, as we do, that the question could not have prejudiced the minds of the jury. It was so held in *Taylor* v. *Commonwealth*, 122 Va. 886, 894, 94 S. E. 795.

In *Cluverius* v. *Commonwealth*, 81 Va. 787, 808, we read: "This court has recognized the right to look to the whole record to determine whether any reversible error has been committed by letting in improper testimony."

There is no merit in this assignment.

It is assigned as error that the court erred in giving and refusing instructions.

In a case where a new trial is awarded it might be incumbent upon the court to enter upon a discussion of the giving and refusing of instructions, but when, after a mature consideration of the questions dealing with the various instructions, we have an abiding conviction that no error was committed, a *seriatim* discussion is wholly unnecessary.

With a full realization that the verdict of the jury is based upon purely circumstantial evidence and that an affirmance thereof means death to the accused by electrocution, we have scrutinized the record with the utmost care. In our opinion there is but one logical conclusion that can be reached, and that is, that the accused is guilty of the wilful, deliberate and premeditated murder of his wife, Audrey Abdell.

The judgment of the trial court must be affirmed.

*Affirmed.*